■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v KARI M. CORDATO, Appellant. [924 NYS2d 649]—

Spain, J.P. Appeal from a judgment of the County Court of Columbia County (Nichols, J.), rendered March 21, 2009, upon a verdict convicting defendant of the crimes of gang assault in the first degree and assault in the second degree.

Around 1:30 A.M. on February 16, 2008, police received an unknown disturbance call and responded to defendant's apart-

---

ment in the City of Hudson, Columbia County, where they found Floyd Sanders, the victim, on the rear porch, unconscious and bleeding. There were many people present, all friends, including defendant, codefendants Bruce Smith and Kevin Allen, as well as Smith's wife and others. Testimony at trial established that the Smiths had been at the nearby apartment of the victim and his family when one of the friends produced a handwritten list, allegedly made by the victim, recording names—including the names of children—with graphic specifics regarding his molestation or rape of them. The names of Smith's 13-year-old stepdaughter and defendant's eight-year-old daughter were on the list. Smith became very angry, confronted and threatened the victim and punched him in the face several times. Smith and the victim then walked down the street to defendant's apartment, followed by Smith's wife, where she showed defendant and Allen the list. Defendant recognized the victim's handwriting on the list. Defendant's daughter was summoned from her sleep to confirm the molestation, and then the victim was beaten by several people in the group. After police arrived, Smith was arrested. The victim died a week later due to blunt force trauma to the head. Defendant, Smith and Allen were jointly indicted for manslaughter in the first degree and gang assault in the first degree. Defendant's motion for a separate trial was denied, although Allen was later granted a severance and tried separately.[1]

After a *Huntley* hearing, County Court denied defendant's and Smith's motions to suppress their oral and written statements to police. At the joint trial of defendant and Smith, the key issues were the victim's physical condition upon arriving at defendant's apartment, i.e., the extent of his injuries inflicted by Smith at the victim's apartment, and who among the group had participated in the beating and contributed to the victim's further injuries at defendant's apartment. Of those present in defendant's apartment during the assault, only Smith's wife and defendant testified. Smith's wife confirmed—as did the victim's girlfriend—that Smith had punched the victim several times at the victim's apartment, causing his lip to bleed. The victim, however, was able to walk with Smith to defendant's apartment where an argument erupted among the growing group of friends over the list and who knew about it. She denied observing Smith strike the victim at defendant's apartment. While Allen and Smith were at first in the kitchen arguing, according to Smith's wife, after defendant's daughter confirmed the abuse, some of the group remained in the kitchen, everyone was yelling and cursing and "all hell broke loose."

---

1. Allen was reportedly acquitted after his separate trial.

By all accounts, the scene was chaotic and defendant became hysterical—crying, shaking, yelling and repeatedly vomiting after seeing the list. Allen hit the victim first and then defendant hit the victim. At some point, others arrived and, during the beating, Smith went into the living room with one friend who restrained him as he argued with another friend over the friend's prior knowledge of the list. Smith's wife left the kitchen during the beating and, when she returned, the victim was on the floor covered in blood and Allen was next to him also covered in blood asking for help to bring the victim to the hospital. Defendant testified that when the victim arrived with Smith, the victim's face was visibly swollen and bleeding and she told police she hardly recognized him. She testified that she never hit the victim, was not in the kitchen during the beating and did not observe his beating. When she returned to the kitchen, he was bloody and surrounded by Allen, Smith and two others. She admitted to pouring rum on the victim, briefly considered setting him on fire, but decided against it, and then left the room.

When police arrived and asked who did this to the victim, defendant volunteered, "If . . . ing did it, that mother f . . . er raped my daughter," and again "I did it." Minutes later, defendant told another officer, "I kicked him. I hit him with the f . . . ing chair." In her written signed statement later that morning, as redacted, defendant admitted she "went crazy" and "kicked and hit" the victim after learning of the abuse. Smith told the responding officer, "I did it, I beat his ass" because the victim was "raping little kids." Smith made several subsequent statements to police explaining that he did it to protect his family. At trial, defendant testified that she falsely confessed because she was hysterical and to protect her friends from trouble, not realizing how seriously the victim had been injured.

Defendant was convicted after a jury trial of gang assault in the first degree, and assault in the second degree as a lesser included offense of manslaughter in the first degree. Smith was convicted of gang assault in the second degree and assault in the second degree. Defendant was thereafter sentenced as a second felony offender to a prison term of 25 years, with five years of postrelease supervision on the gang assault conviction, and to a concurrent five-year prison term on the assault conviction, and she now appeals.

Initially, defendant was indicted for manslaughter in the first degree but convicted of the lesser crime of assault in the second degree (*see* Penal Law § 120.05 [1]), and also indicted and convicted of gang assault in the first degree (*see* Penal Law § 120.07). We agree with defendant's contention that her convic-

tion for assault in the second degree should be reversed and that count dismissed because it is a lesser included offense of gang assault in the first degree, "since it would be impossible for defendant to have committed the latter crime without concomitantly committing, by the very same conduct, the former crime" (*People v Alford*, 65 AD3d 1392, 1394 [2009], *mod* 14 NY3d 846 [2010]; *see* CPL 1.20 [37]). To be convicted of gang assault in the first degree, the jury had to find that defendant, acting "with intent to cause serious physical injury to another person," caused such injury "aided by two or more other persons actually present" (Penal Law § 120.07). To convict defendant of assault in the second degree as charged, the jury had to conclude that defendant acted "[w]ith intent to cause serious physical injury to another person" and caused such injury (Penal Law § 120.05 [1]). With respect to such inclusory concurrent counts (*see* CPL 300.30 [4]), "[a] verdict of guilty upon the greatest count submitted is deemed a dismissal of every lesser count submitted" (CPL 300.40 [3] [b]; *see People v Horton*, 46 AD3d 1225, 1227 [2007], *lv denied* 10 NY3d 766 [2008]). Thus, while not preserved by defendant at trial, modification of the judgment is warranted to the extent of reversing the assault in the second degree conviction and dismissing count one of the indictment (*see People v Beauharnois*, 64 AD3d 996, 999-1000 [2009], *lv denied* 13 NY3d 834 [2009]).

Defendant also contends that County Court erred in denying the request to charge assault in the second degree as a lesser included offense of gang assault in the first degree, of which she was convicted. Defendant joined the timely request of Smith's counsel to submit this lesser charge (*see People v Ryan*, 55 AD3d 960, 964 [2008] [request for submission of lesser offense is not untimely if made before jury retires for deliberations]), and we find that there was a reasonable view of the evidence to support a finding that defendant committed the lesser offense (assault in the second degree), but not the greater offense (gang assault in the first degree) (*see People v Miller*, 6 NY3d 295, 301 [2006]; *People v Van Norstrand*, 85 NY2d 131, 135-136 [1995]). However, under the circumstances here, the general rule is inapplicable requiring reversal of a conviction where a trial court improperly refuses to submit a lesser offense to the jury (*see* CPL 300.50 [2]). Notably, defendant was convicted of gang assault in the first degree as charged in the indictment, and the court charged, as the next lesser included offense thereof, gang assault in the second degree, which the jury never reached having convicted defendant of the higher indicted count; the court refused to charge assault in the second degree as a *further* lesser included offense. In this scenario, "where a court charges the next lesser

included offense of the crime alleged in the indictment, but refuses to charge lesser degrees than that, . . . the defendant's conviction of the crime alleged in the indictment forecloses a challenge to the court's refusal to charge the remote lesser included offenses" (*People v Boettcher*, 69 NY2d 174, 180 [1987]; *see People v Waugh*, 52 AD3d 853, 855 [2008], *lv denied* 11 NY3d 796 [2008]). Thus, "defendant's conviction of the higher count [gang assault in the first degree] forecloses her challenge to the court's refusal to charge the more remote lesser included offense of [assault in the second degree]" (*People v Waugh*, 52 AD3d at 855).

Next, we are not persuaded that County Court abused its discretion in denying defendant's pretrial motion and repeated mid-trial motions for severance, as the core of each defense was not in "irreconcilable conflict with the other" and there was not "a significant danger, as both defenses [were] portrayed to the trial court, that the conflict alone would lead the jury to infer defendant's guilt" (*People v Mahboubian*, 74 NY2d 174, 184 [1989]; *see* CPL 200.40 [1]; *People v Cardwell*, 78 NY2d 996, 997-998 [1991]). At trial, defendant denied participating in or witnessing the beating and she did not implicate Smith in the beating at her apartment, although she said that the victim arrived at her apartment already injured. Defendant repudiated her own inculpatory statements to police,[2] but corroborated the testimony of Smith's wife that Smith was restrained by friends in the living room at some point during the beating. Smith's defense was likewise that he did not participate in the beatings at defendant's apartment and that he had not seriously injured the victim earlier when the list was first produced, before arriving at defendant's apartment. Smith did not testify or call any witnesses, his statements to police did not implicate defendant, and his cross-examination of the People's witnesses and opening and closing remarks focused on his own lack of involvement in the beating. Smith's wife, called by the People, testified that she saw defendant strike the victim once but Smith never hit the victim.

Defendant's and Smith's defenses were not in irreconcilable conflict or mutually exclusive, as the jury could have acquitted both, finding that neither had participated in the beating or caused the victim's serious injuries. Defendant and Smith were charged with acting in concert for the same crimes, and the

---

**2.** Defendant's written statement to police was redacted at trial so as to remove all references to Smith's actions, to avoid a *Bruton* confrontation problem if defendant did not chose to testify (*see Bruton v United States*, 391 US 123 [1968]; *cf. People v Pinto*, 56 AD3d 956, 958 [2008]).

proof against them was supplied by their own incriminating statements and essentially the same evidence and, thus, there was a strong public policy favoring joinder of their trials (*see People v Thompson*, 79 AD3d 1269, 1271-1272 [2010]). While Smith's counsel extensively cross-examined defendant and attempted to impeach her credibility, as was Smith's right (*see People v Pinto*, 56 AD3d 956, 958 [2008]) and as the prosecutor had already done, we do not find that Smith's counsel acted as a "second prosecutor" (*People v Cardwell*, 78 NY2d at 998). Smith's counsel was not bound by the court's *Sandoval* ruling (*see People v McGee*, 68 NY2d 328, 333 [1986]),[3] and we do not find that defendant was unduly prejudiced when Smith's counsel asked her about a conviction for endangering the welfare of a child. The court sustained defendant's objection and defendant was able to explain the circumstances on redirect, minimizing its impact.

Next, we discern no errors in County Court's *Huntley* ruling, admitting into evidence defendant's statements to, or in the presence of, police officers. The record fully supports the court's determination that defendant's inculpatory statements to the police officers who responded to the scene were noncustodial and were in response to the officers' initial, brief investigatory questions aimed at ascertaining what had just occurred (*see People v Steinhilber*, 48 AD3d 958, 959 [2008], *lv denied* 10 NY3d 871 [2008]; *People v Brand*, 13 AD3d 820, 822 [2004], *lv denied* 4 NY3d 851 [2005]). Defendant was not isolated, interrogated, handcuffed, arrested, threatened, coerced or prevented from leaving, and she was not entitled to suppression of those statements based upon the absence of *Miranda* warnings or their claimed involuntariness (*see People v Hook*, 80 AD3d 881, 882-883 [2011]; *People v Pouliot*, 64 AD3d 1043, 1044-1046 [2009], *lv denied* 13 NY3d 838 [2009]).

Likewise, the suppression testimony established that defendant voluntarily went to the police station hours later, around 8:00 A.M., where she spoke with a detective for about 40 minutes and provided a signed statement. There was no evidence of coercive tactics and defendant was not arrested or handcuffed; she was free to leave and did, in fact, leave the station after giving the statement and was not arrested for another two months. Given the noncustodial investigatory setting, *Miranda* warnings were unnecessary (*see People v Pouliot*, 64 AD3d at 1046) and there is no evidence that police purposefully delayed arresting defendant at that point to avoid *Miranda* warnings (*see People v*

---

**3.** The People had already questioned defendant regarding her prior forgery conviction, as permitted by County Court's *Sandoval* ruling.

*Thomas*, 21 AD3d 643, 644 [2005], *lv denied* 6 NY3d 759 [2005]). To the extent that defendant argues that her presence at the station was partially obtained by the ruse of discussing the crimes against her daughter, rather than the beating of the victim, the record fully supports the conclusion that her presence· and ultimate statement were voluntary (*see People v DeJesus*, 45 AD3d 986, 986 [2007], *lv denied* 9 NY3d 1032 [2008]).

Defendant's remarks at her apartment later that day, around 12:55 P.M., to a child protective caseworker investigating the welfare of the children in her apartment, in the presence of a police officer, were also properly ruled admissible. The officer's presence was known to defendant, and it was a common practice to provide protection to caseworkers under these circumstances. The officer did not question defendant and, other than attempting to help calm the still-upset defendant, was not involved in the caseworker's questioning. The testimony supports the conclusion that defendant's statements to the caseworker, overheard by the officer, were noncustodial, voluntary and were not made to a "public servant engaged in law enforcement activity" or to one acting at the direction or in cooperation with law enforcement (CPL 60.45 [2] [b]; *see People v Texidor*, 71 AD3d 1190, 1191 [2010], *lv denied* 14 NY3d 893 [2010]; *cf. People v Wilhelm*, 34 AD3d 40, 44-48 [2006]). Finally, defendant's initial statement to an officer while being transported after her arraignment in April 2008 was spontaneous, and her subsequent remark in response to his comment was arguably not incriminating. In any event, any error in its admission was harmless (*see People v Gause*, 50 AD3d 1392, 1394 [2008]).

The verdict is supported by legally sufficient evidence and is not against the weight of the credible evidence. The trial proof, viewed most favorable to the People, including the testimony of Smith's wife and regarding defendant's admissions to police, established beyond a reasonable doubt that defendant, acting in concert with Smith, acted with intent to cause serious physical injury, caused such injury to the victim (or intentionally aided same) and did so while aided by two or more of those persons present, as required to sustain the first degree gang assault conviction (*see* Penal Law §§ 20.00, 120.07; *People v Sanchez*, 13 NY3d 554, 563-568 [2009]; *People v Bleakley*, 69 NY2d 490, 495 [1987]). Despite defendant's contention, we do not find that the testimony that she was hysterical, distraught and physically ill by the revelation of the victim's apparent heinous crimes against her child established, as a matter of law, her inability to form the requisite intent, i.e., her conscious objective (*see* Penal Law § 15.05 [1]).

Viewing the evidence in a neutral light, a different verdict would not have been unreasonable and, weighing the probative force of the conflicting testimony and the strength of the conflicting inferences to be drawn, we are not persuaded that the jury's verdict should be set aside as against the weight of the evidence (*see People v Bleakley*, 69 NY2d at 495). Smith's wife testified that, despite being high, having a blurred, alcohol-impaired memory and being extremely upset, she saw defendant hit the victim once and then she left the kitchen, although she could not recall the circumstances, i.e., when and how or where on his person defendant hit him or if the victim was still standing. She did not tell police when she gave statements that she saw defendant hit the victim. While she denied that her husband ever hit the victim at defendant's apartment, her motive in implicating defendant over her husband was explored. Smith, like Allen, had considerable blood on his person when police arrived; while there was no blood on defendant's person or the leg of the chair she identified as the one she used to strike the victim, that may have been attributable to the fact that the victim's injuries were largely internal, although there was blood all over the kitchen where the assault occurred. By all accounts, defendant's intent to injure the victim was formed suddenly, under extreme conditions of emotional distress. In the end, however, any lingering doubt as to defendant's guilt is overcome by her own statements to police, in which she admitted hitting and kicking the victim because of her belief that he had raped her daughter. Defendant's statements and the account of Smith's wife persuasively establish that defendant was aided by two or more persons in the group actually present who were "in a position to render immediate assistance to the defendant" (*People v Sanchez*, 13 NY3d at 564).

Finally, however, we are persuaded that the present circumstances warrant reduction, in the interest of justice, of the maximum 25-year sentence imposed upon defendant as a second felony offender for gang assault in the first degree, a class B violent felony (*see* Penal Law § 70.02 [1] [a]; § 70.06 [6] [a]). While the jury, by its verdict, found that defendant intentionally caused or aided in causing serious physical injuries to the victim and she must be held accountable for that conduct, its acquittal on the manslaughter charge reflects the absence of proof that she caused injuries leading to his death. Although her admitted conduct in hitting and kicking the victim was violent, it also was clearly not premeditated and occurred under extreme circumstances of mental and emotional stress. This conduct occurred after a chaotic and highly-charged confrontation late at night—which she did not initiate—when a group of friends burst

into her home raising graphic allegations—confirmed as to her daughter—that the victim, a close friend who had babysat her five children many times, had severely sexually abused her young daughter. Under the circumstances, we do not find that defendant's role in this assault supports the conclusion that she represents the type of "threat to public safety" that this enhanced crime against "assaults committed by gangs" is designed to target (*People v Sanchez*, 13 NY3d at 565 [internal quotation marks and citations omitted]). We have also considered that her only prior felony was nonviolent (possession of a forged instrument), as well as the fact that she was on probation[4] for that offense at the time of this incident. Given the available sentencing range of $8^1/_3$ to 25 years, we exercise our interest of justice jurisdiction to modify her prison sentence to 15 years (*see* CPL 470.15 [6] [b]). Defendant's remaining claims lack merit.

Lahtinen and Egan Jr., JJ., concur.

McCarthy, J. (concurring in part and dissenting in part). We agree with the majority on all aspects of this case except the sentence. The determination of what constitutes an appropriate sentence lies within the trial court's sound discretion (*see People v Minor*, 45 AD3d 885, 886 [2007], *lv denied* 10 NY3d 768 [2008]). Although this Court has the authority to modify, "as a matter of discretion in the interest of justice," a legal sentence that is "unduly harsh or severe" (CPL 470.15 [6] [b]), we exercise that discretion sparingly. It is not our role to substitute the sentence that we would have imposed had that been our obligation in the first instance; instead, we are to review the sentence imposed by the court that was granted that initial authority. Absent extraordinary circumstances or a clear abuse of discretion by the sentencing court, we generally defer to that court—which observed the trial and was directly involved with all aspects of the case—and decline to interfere with its determination of what sentence to impose (*see People v Somerville*, 72 AD3d 1285, 1288-1289 [2010]; *People v Maggio*, 70 AD3d 1258, 1261 [2010], *lv denied* 14 NY3d 889 [2010]; *People v Elliot*, 57 AD3d 1095, 1097 [2008], *lv denied* 12 NY3d 783 [2009]). In this case, we should adhere to our general policy and decline to disturb the legal sentence imposed by County Court.

We note that the majority does not explicitly identify how the sentencing court clearly abused its discretion or what circumstances here are extraordinary, as opposed to factors that would simply support a lesser sentence (*compare People v Fernandez*,

---

4. After this arrest, defendant was sentenced to an additional $1^2/_3$ to 5 years in prison for violating that probation.

84 AD3d 661, 662-664 [2011], *with id.* at 664-665 [Sweeny, J., dissenting]). The reasons the majority lists for diverging from our usual course and reducing defendant's sentence include defendant's lack of premeditation, her mental and emotional stress at the time of the crime, that her prior conviction was for a nonviolent crime, and that her actions purportedly do not represent typical "assaults committed by gangs" that were targeted by the statute she was found to have violated.

Regarding the last reason on that list, while the majority notes that defendant did not participate in what would typically be considered a gang assault, the Court of Appeals case cited by the majority does not support reduction of her sentence. In that case, the Court noted that "one of the primary purposes of the crime of gang assault was to recognize that when a victim is confronted by a group of individuals, rather than one individual, he or she is confronted with a more threatening, intimidating and dangerous situation that increases the possibility of escalating violence and physical harm" (*People v Sanchez*, 13 NY3d 554, 565 [2009]). Defendant was not a member of a street gang, but the statute is not limited to punish assaults by such individuals. Defendant's actions, in conjunction with those of the other individuals who were present, created a "spontaneous and frenzied event[ ]" that was "dangerous precisely for [its] chaotic nature" (*id.* at 566); this is the type of conduct that the statute was enacted to prevent, or at least punish if committed. Regardless of the Legislature's intent when enacting the statute, defendant was convicted of gang assault in the first degree and County Court was required to impose a sentence provided by law for commission of that crime. The court exercised its discretion in imposing such a sentence here.

The other reasons mentioned by the majority are valid considerations affecting sentencing, which could have resulted in the imposition of a lesser sentence. But countervailing factors are also present here to support the lawful sentence imposed by County Court. While defendant only had one prior conviction, the previous crime was a felony and she was still on probation at the time she committed this violent and fatal gang assault. Defendant was understandably upset and outraged when confronted with allegations that the victim sexually assaulted her child, which could have caused her to lash out without thinking, but defendant apparently did not attempt to contact the police and follow proper channels to deal with the victim's alleged crimes. As the court noted during sentencing, defendant "at any time had the opportunity to cease and desist from the activity" constituting the crime for which she now

stands convicted. She declined to avail herself of that opportunity, choosing instead to serve as a self-appointed investigator, prosecutor, judge, jury and executioner for the victim. The victim was not charged, indicted, tried, convicted or sentenced for the crimes he allegedly committed and, under our system of justice, he was presumed innocent. Defendant and her codefendants deprived the victim of the rights afforded by our laws to those accused of committing crimes. Defendant, on the other hand, was duly convicted and sentenced in accordance with those rights. Society has a significant interest in discouraging vigilantism, which could be furthered by imposing lengthy sentences on those who take the law into their own hands.

Reducing such a sentence does not comport with the interest of justice. Nearly every victim of a crime or harmful act has family or loved ones who are emotionally affected by their death or injury. The majority's stance here sends a message to those caring people that they will receive lighter sentences if they act on their vengeful urges and engage in self-help on behalf of their family or loved ones rather than working through the proper channels of our justice system. This message does not serve the interest of justice.

Defendant's sentence cannot be reduced on the basis that she assaulted the victim as the result of extreme emotional stress when she strongly asserts that she did not assault the victim at all; these arguments are contradictory. Defendant's version of the events changed over time to suit her own interests. When police first arrived at the scene, and before anyone knew that the victim's condition would result in his death, defendant nearly boasted that she had attacked the victim. In her written statement to police, which was provided several hours after defendant's violent and barbaric gang assault but before the victim's critical condition was known, defendant again admitted her involvement and justified her actions because she believed that the victim had touched her daughter's private parts. At trial, after the victim had died and defendant was charged with serious crimes, she testified that her confessions were false and she denied any participation in the assault. At sentencing, defendant apologized to the victim's family and acknowledged that she should have intervened to stop the assault. She did not show true remorse or accept responsibility for her actions, however, because—consistent with her trial testimony but contrary to her statements to the police—she continued to deny her participation in the assault, stating, "I never touched him. I'm already doing time for a crime I didn't do." The jury could not have convicted defendant if it believed her protestations of

innocence; in other words, the jury considered her testimony false. As noted by the Probation Department in the presentence investigation report, defendant "ha[d] the presence of cognitions that serve to justify, support, or provide rationalizations for her criminal behavior [which] include moral justification, refusal to accept responsibility, blaming the victim, and excuse making that minimizes the seriousness and consequences of her criminal activity." These factors militate against a reduced sentence (compare People v Boone, 287 AD2d 461, 461-462 [2001], lv denied 97 NY2d 727 [2002], with id. at 462-463 [Smith, J., concurring in part, dissenting in part]).

Although defendant was acquitted of manslaughter, the jury found her guilty of gang assault and her participation in that crime contributed to and resulted in the victim's brutal death.[1] Juries acquitted one codefendant of all charges, found another codefendant guilty of gang assault in the second degree and assault in the second degree, and found defendant guilty of gang assault in the first degree and assault in the second degree;[2] thus, according to the juries, defendant was determined to be the most culpable among all of the participants in the savage beating that resulted in the victim's death. After noting "the heinous and violent nature of the crime which [defendant] perpetrated," County Court imposed the maximum sentence. While the majority apparently would not have chosen to impose the maximum sentence on defendant under the circumstances here if they were imposing the sentence in the first instance, the statute provides us with the authority to modify sentences that are "unduly harsh or severe," not to sentence defendants de novo (CPL 470.15 [6] [b]). Because some factors present here support the maximum sentence and others would support a more lenient sentence, it would be contrary to our policy and precedents of deference to say that County Court—after weighing those factors—clearly abused its sentencing discretion or that extraordinary circumstances exist that would warrant this Court modifying the sentence in the interest of justice (see People v Lanfair, 18 AD3d 1032, 1034 [2005], lv denied 5 NY3d 790 [2005]). Therefore, we should defer to the sentencing court's determination and affirm the lawful sentence imposed for defendant's conviction of gang assault in the first degree.

---

1. The official cause of death was "[m]ultiple system organ failure due to severe closed head injuries with cerebral edema due to blunt force trauma." Although, as the majority notes, the victim did not die until a week after the assault, he was comatose during that entire time and underwent brain surgery to relieve the pressure in his skull before he developed pneumonia and his organs failed.

2. The majority correctly vacated defendant's conviction for assault in the second degree.

Kavanagh, J., concurs. Ordered that the judgment is modified, on the law and as a matter of discretion in the interest of justice, by reversing defendant's conviction of assault in the second degree under count one of the indictment; said count dismissed, the sentence imposed thereon vacated, and defendant's sentence under count two of the indictment is reduced to 15 years; and, as so modified, affirmed.