OPINION OF THE COURT
Wachtler, J.
The primary question on this appeal concerns the admissibility, under the State Constitution, of statements concerning the whereabouts of a kidnap victim made by the kidnapper to the police after he had been arrested and had asserted his right to counsel. The trial court held that the defendant’s rights had not been violated and that all his statements were admissible. He was subsequently convicted of felony murder and related offenses at a jury trial. The Appellate Division affirmed the conviction concluding that some of the statements, made after the defendant had led the police to the victim’s body, should have been suppressed but that the error was harmless under the circumstances. The defendant appeals.
In May, 1977 the victim, Trudy Farber, resided with her husband Roger at Sackett Lake, New York. Both of the Farbers had jobs outside the home. On the evening of May 24, 1977, Roger Farber arrived home with his business partner at approximately 5 o’clock. After entering the house, they encountered a man wearing a ski mask who was armed with a rifle. The man motioned them to the floor and tied their hands behind their backs. The man then showed Roger Farber a note asking when Trudy was expected home and was told she should be back about 5:30. The man informed Farber, with another note, that he should not call the police or the FBI and that Trudy’s father, Harry Resnick, “would be contacted”. When Trudy Farber arrived soon thereafter, the man abducted her and led her at gunpoint through the woods at the rear of the premises.
After freeing himself, Roger Farber called his father-in-law and the FBI. The State Police and the local Sheriff’s office were also notified. With the consent of Farber and the Résnicks, wire taps were placed on their telephones. At approximately 6:30 that same evening a man telephoned Mr. Resnick and demanded a million dollars ransom for his daughter’s safe return. Resnick agreed to try to raise the *193 money. The next evening at about 11 o’clock a man called and asked for Mr. Resnick. This call was answered by Roger Farber. Although the caller immediately hung up, Farber was able to identify the voice as that of the defendant. Farber had known the defendant for several years. Their parents had been business associates at one time, they had hunted together on at least one occasion, and, more recently, the defendant had asked Farber to invest in a bar.
On the morning of May 26,1977 two State Police investigators, Fuente and Chandler, went to the defendant’s home where he resided with his parents. In the garage they noticed an orange Corvette which seemed to fit the description of a car seen by neighbors near the Farber residence at the time of the kidnapping. When the defendant came out, Fuente informed him that they were trying to find Trudy Farber, who had been kidnapped, and that they believed the defendant may have information which might help them. Fuente noted the results of the investigation thus far with respect to the car and the identification of the defendant’s voice by the victim’s husband. He also advised the defendant of his rights under Miranda v Arizona (384 US 436). The defendant said that he did not want a lawyer and told the police that he might know “something” or someone who knew where the victim was. However the defendant wanted $400,000 for the information. He then entered his car and attempted to start it, but Chandler removed the keys and Fuente asked the defendant to come to the police station to see if he could assist in the investigation. Defendant agreed to go with the officers.
At the police station the defendant continued to demand large sums of money for information concerning the victim’s whereabouts and asked the police to produce the victim’s father so that arrangements could be made for payment. He repeatedly stated that the victim was safe and that he would lead them to her if her father would agree to meet his monetary demands. At other times he stated that he did not know where the victim was, or “exactly” where she was, and refused to provide any information without compensation. On several occasions he suggested that the victim’s husband was involved in the *194 kidnapping and that the police should, seek his assistance. He admitted, however, that he had made the two phone calls demanding $1,000,000 in ransom money. During the discussions he stated that he would accept $400,000 and later reduced his demands to $300,000 indicating that $100,000 would be paid to the victim’s husband. Indeed, in the officer’s presence, he drafted a written agreement for the victim’s father, to sign assuring the payment of the money demanded. He also drafted another agreement for the police to sign which, in essence, granted him immunity for his cooperation. When the officers stated that they could not sign such an agreement, the defendant started to leave. At that point the officers informed him that he was under arrest. The defendant then asked to speak with a lawyer and all questioning ceased.
The defendant initially requested a Florida attorney but when the police suggested that might be impractical, the defendant called a local attorney who had previously represented his family. When the attorney came to the station house the defendant informed him that he could not pay his fee, unless he received the money demanded of the victim’s father. The attorney left after informing the defendant, and the police, that he would not represent the defendant and had recommended that the defendant call Legal Aid.
The police asked the defendant if he wanted to consult with a Legal Aid lawyer; the defendant replied that he would act as his own attorney. He also persisted in his refusal to provide the police with any information concerning the victim and repeated his request that the police produce the victim’s father so that a financial arrangement could be made. In addition, he reduced his demands and stated that he would take them to Trudy Farber if her father agreed to pay his attorney’s fees, bail, and $10,000 for “expenses”.
Later that evening the victim’s father met the defendant at the police station and agreed to make these payments. The defendant briefly reasserted his demand for $400,000, but when the police protested that that was not “the deal”, the defendant jumped up and said “Let’s go”.
*195 The defendant was placed in a police car and directed the officers to a wooded area in an adjoining county. He removed some leaves and branches from the ground revealing a grave-shaped hole containing a large box with a lock on the lid. He also produced a key from under a nearby rock. When the box was opened the police found the body of Trudy Farber. A subsequent autopsy showed that she had died of suffocation. At that location the police also found a rifle, ski mask, and clothing fitting the description of the items used by the kidnapper. A sales record, found prior to trial, showed that the defendant had purchased the rifle a short time before the kidnapping.
The police informed the defendant that he was now being held for murder arid noted that there were bullet holes in the lid of the box. The defendant stated that he had tried to ventilate the box by shooting holes in the lid before he placed the victim in it. He also stated that he had returned the next day, opened the box, and had offered Mrs. Farber food and something to drink, but she had refused the food. After being returned to the station house, the defendant gave a full oral confession in response to police questioning.
At about midnight the defendant was arraigned before a Town Justice. He was then transported to the county jail by two police officers who had not been involved in the prior questioning. Without any prompting from the officers, the defendant again provided a full narrative of the kidnapping.
The defendant was indicted for felony murder, kidnapping and burglary. He made a pretrial motion to suppress all of the statements he had made to the police. After a hearing the court denied the motion. The suppression court found that the police questioning of the defendant “became custodial” when they removed the keys from his car at his home. The court noted, however, that “the police were not merely investigating an antecedent crime, but were conducting an investigation during a crime in progress, one of their main purposes, if not the main purpose, being to save the life of the victim”. The court also held that the statements allegedly made by the defendant on the way to jail “were not the result of interrogation, suggestion, or *196 prompting, and were spontaneously volunteered”. The court concluded that those statements made by the defendant “which were the result of interrogation, and any volunteered thereafter, were not made in violation of any of his constitutional rights”. The statements were later admitted at a jury trial and the defendant was found guilty as charged.
The Appellate Division affirmed holding that the police did not violate the defendant’s State constitutional right to counsel by questioning him concerning the victim’s whereabouts after he had been arrested and had asserted his right to counsel, because this type of questioning falls “within the missing person investigation emergency exception” (91 AD2d, at p 44). However, the court found that the emergency ended once the victim’s body was discovered, and therefore the trial court should have suppressed the statements the defendant subsequently made in response to police questioning. Nevertheless, the court concluded that the error was harmless because “[a]t the very most, defendant’s statement after discovery of the body was cumulative, and there is not the remotest possibility that its erroneous admission affected the jury’s verdict” (91 AD2d, at pp 44-45).
On this appeal the defendant raises a number of issues most of which relate to the admissibility of the various statements he made to the police. He urges that the police lacked probable cause to arrest him at his home and that all his statements were therefore tainted (Dunaway v New York, 442 US 200). In this regard the finding of the lower courts that there was probable cause for the arrest involves a mixed question of law and fact, is supported by evidence in the record, and thus is beyond furthér review in this court (see, e.g., People v Alexander, 37 NY2d 202; People v Rizzo, 40 NY2d 425). It is the defendant’s primary contention, however, that all of the statements he made in custody after he asked to speak to an attorney should be suppressed because they were obtained in violation of his right to counsel under the State Constitution. He also raises related points, including a contention that his right to counsel under the United States Constitution was violated.
*197 With respect to the Federal constitutional right the defendant relies on Edwards v Arizona (451 US 477). In that case the Supreme Court stated (at pp 484-485) that a defendant who has “expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police”. The case now before us does not indicate any breach of that restriction.
A more substantial argument is presented by the defendant’s reliance on the State constitutional right to counsel which generally affords broader protections than. its Federal counterpart (People v Hobson, 39 NY2d 479, 483-484). The defendant places special reliance on People v Cunningham (49 NY2d 203) in which we stated (at p 205): “[0]nce a suspect in custody requests the assistance of counsel, he may not be questioned further in the absence of an attorney. We intend by our holding to make it clear that an uncounseled waiver of a constitutional right will not be deemed voluntary if it is made after the right to counsel has been invoked”. The application of this rule to the defendant’s statements, made at a time the police were attempting to find the missing woman and after he invoked his right to counsel, poses a novel question. The issue was previously discussed in People v Knapp (57 NY2d 161). However, this is the first case to reach our court in which the issue was properly preserved for appellate review at the suppression hearing.
The rule precluding the police from questioning a person in the absence of counsel, once the right to counsel has indelibly attached under the State Constitution, is exceptional because it represents a departure from the. general rule that constitutional rights may be waived, provided only that the waiver is voluntary and knowing (Johnson v Zerbst, 304 US 458). The special requirement imposed by the State Constitution is designed to protect the accused from the coercive power of the State intent on prosecuting him for a criminal offense (People v Hobson, supra). It brings to criminal prosecutions the ethical principle which has long applied to civil cases, even “the least-consequen *198 tial civil matter” (People v Hobson, supra, at p 484), that “[o]nce a matter is the subject of a legal controversy any discussions relating thereto should be conducted by counsel” (People v Settles, 46 NY2d 154,164). Thus the rule has been broadly applied in cases where the only purpose of the police inquiry was to solve a crime or gather evidence against the defendant for trial (see, e.g., People v Hobson, 39 NY2d 479, supra; People v Singer, 44 NY2d 241; People v Settles, 46 NY2d 154, supra; People v Rogers, 48 NY2d 167; People v Skinner, 52 NY2d 24; People v Bartolomeo, 53 NY2d 225).
In none of these cases did the life or safety of the victim depend on the success of the police investigation. Application of the rule to such an investigation would involve more than a purely logical extension because it would bring the rule into conflict with other principles, equally well settled in the law, concerning the power of the police to respond to emergencies consistent with constitutional limitations.
A primary role of the police is to prevent crime and provide emergency assistance to those whose lives may be in danger. Once a crime has been committed the police generally assume their secondary role of attempting to apprehend the person responsible, and gathering sufficient evidence to obtain a conviction. A rule which prohibits the police from questioning a person represented by counsel unless the attorney is present, naturally limits the investigative techniques available to the police (People v Middleton, 54 NY2d 474). When the sole purpose of the investigation is to solve a crime or obtain evidence needed to secure a conviction, this restriction has often meant that the guilty party must go free. But if the same restriction is imposed in cases where the police are engaged in their primary duty of attempting to provide assistance to a person whose life is, or may be, in danger, there is the additional risk that delay or frustration of the investigation may result in death or injury of the victim.
In Fourth Amendment cases this court and others have recognized an emergency exception which permits the police to enter premises, without a warrant or probable cause to believe that a crime has been committed, in order to *199 search for a person who is missing and may be in danger (People v Mitchell, 39 NY2d 173). In that case we observed (at p 180, quoting from Warden v Hayden, 387 US 298-299) that “ e[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others’ ”. Delay of the investigation may also prove fatal to the missing person when it is occasioned by the inability of the police to employ the usually less-intrusive technique of making inquiry of all persons, even those who may be represented. by counsel, if they are likely to have, or actually claim to have, information of the person’s whereabouts.
The emergency exception adopted in the Fourth Amendment cases undoubtedly reflects the reasonableness standard incorporated in that amendment. However, the State constitutional right to counsel is also subject to limitations dictated by reason and policy. The police are not obligated to silence a talkative defendant. Spontaneous statements made after the right to counsel has indelibly attached are admissible even though they may be said to represent an implicit waiver of the right to counsel in the absence of an attorney (see, e.g., People v Rivers, 56 NY2d 476; see, also, People v Bryant, 59 NY2d 786). We have also held that a defendant who after being arrested offers the policeman a bribe, is not immune from further questioning with respect to the bribe merely because he asserted his right to counsel at the time of his initial arrest (People v Middleton, 54 NY2d 474, supra). We noted (at p 482) that a contrary holding would “unrealistically * * * limit investigatory procedures relating to bribe offers”. We have also observed that the right to counsel may not be used as a “shield” so as to permit a defendant to commit new crimes with impunity while in police custody (People v Mealer, 57 NY2d 214, 218; see, also, People v Ferrara, 54 NY2d 498, 508). Similarly, any extension of the right to counsel which would hinder the police in the performance of their emergency duties is also unwarranted.
When the police are searching for a person who has recently disappeared, the need to provide prompt assistance is not terminated once the police learn that the *200 person has been abducted. Even if the suspected kidnapper has been arrested the police emergency role may continue as long as the victim’s whereabouts remains unknown. It would not be reasonable or realistic to expect the police to refrain from pursuing the most obvious, and perhaps the only source of information by questioning the kidnapper, simply because the kidnapper asserted the right to counsel after being taken into custody. To hold that the special restrictions of the State right to counsel rule extend into this area of police activity would either dangerously limit the power of the police to find and possibly rescue the victim or would, perversely, permit the kidnapper to continue his ransom demands and negotiations from the sanctuary of the police station. We therefore hold that the police did not violate the defendant’s right to counsel under the State Constitution by questioning him concerning the victim’s whereabouts.
 The police, however, should not have continued to question the defendant in the absence of counsel once the victim’s body was found. At that point the questioning could only serve to provide evidence for use against the defendant at trial. That is precisely the type of police inquiry in which the State right to counsel was intended to provide the accused with added protection by prohibiting the police, and prosecutors, from questioning him in the absence of counsel when he had previously asserted the right during the police investigation (People v Cunningham, supra; People v Skinner, 52 NY2d 24, supra; People v Singer, 44 NY2d 241, supra). As noted, that would not preclude the defendant from making spontaneous statements. Although the defendant contends that none of his statements were spontaneous, that issue is beyond the scope of our review. The determination made by the lower courts, that any statements he made on the way to jail were spontaneous, involves another mixed question of law and fact which is supported by evidence in the record, and thus poses no question of law for this court to consider (People v Bryant, supra; People v Rivers, supra; People v Harrell, 59 NY2d 620). In sum, the Appellate Division correctly held that the only statements which should have been suppressed were the oral confession the defendant *201 made in response to police questioning, after the victim’s body was found, and before the defendant began his trip to the county jail.
The defendant also argues that the Appellate Division erred in concluding that the admission of the improperly obtained confession was harmless error. He contends that all of his statements prior to discovery of the body “can be characterized as an attempt to sell information as to the whereabouts of a missing person” and that without his subsequent statements he would not have been implicated in her death. This argument erroneously assumes that the defendant’s final confession, made on the way to jail, is also inadmissible. Since the first confession is essentially the same as the later spontaneous one, its admission was cumulative as the Appellate Division observed. In addition, the jury properly had before it evidence, including the defendant’s own admission, that he had made the two ransom phone calls, that even after his arrest he continued to negotiate his monetary demands, and that when he led the police to the victim’s body, the officers found at the scene the rifle and other tokens of the kidnapper, which were shown at the trial to have been purchased by the defendant or were otherwise connected with him. In light of all this evidence identifying the defendant as the kidnapper, there is no reasonable possibility that the jury would have reached a different conclusion had it been informed that after the defendant led the police to the victim’s body he made only one full oral confession, instead of two virtually identical ones.
We have considered the defendant’s other arguments and find that most of them have not been preserved for review and that the remaining ones lack merit.
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Cooke and Judges Jasen, Jones, Meyer and Kaye concur; Judge Simons taking no part.
Order affirmed.