(January 8, 1987)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v FREDERICK RHOADES, Appellant.—Yesawich, Jr., J. Appeal, from a judgment of the County Court of Sullivan County (Scheinman, J.), rendered April 23, 1981, upon a verdict convicting defendant of three counts of the crime of murder in the second degree.

On September 20, 1979, Margie Polizzi was raped, sodomized and, before her untimely death, severely beaten. The County Coroner testified that stab wounds in the sternum and abdomen, delivered with forceful thrusts. made without any hesitation, caused her death.

The victim, a 20-year-old girl who unfailingly arrived home on time, had not returned by 3:00 A.M., prompting an immedi-

ate search by her brother and family friends. After discovering her car, a 1963 Studebaker, abandoned on a roadway leading home from a tavern where she had last been seen, the searchers' inquiry focused upon defendant, who they learned had been present with her at the tavern. Further investigation revealed information about this theretofore stranger that was "very disturbing". Their calls to the police resulted in a joint investigation by the State Police and local Sheriff's department. That investigation uncovered traces of blood on both the inside and outside of the victim's car and human hair, reports by passersby that they had seen another car subsequently identified as belonging to defendant's mother, apparently abandoned in the middle of the road with its lights on, situated one-half mile away from the victim's abandoned auto, and further that defendant had displayed a large hunting knife at the tavern immediately preceding the victim's arrival to show his "prison" toughness. Significantly, the authorities also discovered defendant had been paroled from an Alabama prison to which he had been sentenced for a rape during which he had driven the victim off the road and nearly beaten her to death. Meanwhile, nearly 24 hours had elapsed from the time the victim should have been home.

Based on the foregoing, including sworn statements by the civilian searchers and the passersby, application was made and granted for a warrant to search defendant and the car he was driving. The police then staked out defendant's home. Eventually defendant emerged and departed in the car described in the warrant application. The police followed, motioned defendant to pull over, identified themselves, stated they had a warrant, and informed him that they were investigating a missing person and "that this particular vehicle could be involved in it, and * * * [they] would like to ask him some questions about it if it was all right with him".

After consenting to accompany the officers, he was patted down and read his *Miranda* rights, which he declined to exercise. He did, however, ask to call his employer to advise that he would be late. That call was made at the police substation where Investigator Thomas F. Starace, speaking with defendant, noticed indicia of his involvement in a physical struggle, including scratches on his face and swollen knuckles. Starace explained why a search warrant had been secured but elected not to execute it further for fear that it would adversely impact upon defendant's cooperative attitude. After *Miranda* warnings were again given, acknowledged and waived by defendant, questioning concerning defendant's ac-

tivities on the day of the victim's disappearance began, whereupon defendant furnished the first of a series of conflicting statements concerning the victim's disappearance and death. Meanwhile, a physical search was conducted of the vehicle defendant had been driving; this search rebutted defendant's explanation (he claimed to have been looking for a lost hub cap) of why his car came to be found in the roadway.

Though told he was not required to, defendant agreed to undergo a polygraph test, before which he was again thoroughly apprised of his constitutional rights. In the course of the test defendant provided a second and more elaborate version of the incident, this time indicating that, following consensual sex and an argument, the victim had stabbed him with a knife and while running away was injured when she fell down a ravine. Asked if he would accompany the police to help look for the victim, he consented. Upon arriving at the area where defendant last saw the victim, a bloodied towel was found. Defendant now stated that the victim "was hurt bad". The police, who testified that they were desperately hoping to find her alive and frustrated with defendant's obviously conflicting statements, told defendant they knew he was not telling the truth, whereupon defendant told yet another version of what had happened, this time admitting he had stabbed the victim twice. He then directed the police to the body, which was partially covered under debris. Approximately 15 hours elapsed between his initial encounter with the police and his final confession. He was arrested, and while being processed made unprompted, damaging admissions.

Following a hearing, defendant's motion to suppress all statements and physical evidence was denied, after which defendant was convicted by a jury of three counts of murder in the second degree (one count of intentional murder and two counts of felony murder). Subsequent to trial, a portion of the trial transcript containing the trial court's charge to the jury was lost, and before a reconstruction proceeding could be completed the Trial Judge died, necessitating another hearing. The reconstruction hearing court certified the People's version of the charge as an accurate reproduction of the trial court's original charge. This appeal ensued.

Initially, we find no merit in defendant's contention that probable cause to issue the search warrant was lacking. The warrant application was adequately buttressed by statements of various civilians linking defendant and the victim together at the bar immediately prior to her disappearance, as well as the juxtaposition of their abandoned cars with the victim's

containing signs of violence, and a statement from the police disclosing that defendant had recently been released from prison where he had been serving a sentence for a rape in which his victim was beaten.

The suggestion that the police had no intention of executing the warrant, and used it merely as a "ruse" to unlawfully seize defendant and coerce his confession, is belied by the record. Though the warrant was not in fact shown to defendant, this is of no moment for he never requested to see it and went with the police voluntarily, vitiating the need to produce it (CPL 690.50 [3]). And the parallel assertion that the fact that the search warrant was not returned until five days after it was executed indicates the police had no intention of lawfully executing the warrant is similarly unavailing. Warrants which are otherwise lawful, as the instant warrant was, are not rendered unlawful by noncompliance with the requirement that they be returned in a timely manner. Such noncompliance amounts to a breach of a ministerial duty and does not invalidate the warrant or the search *(People v Davis,* 93 AD2d 970, 971).

Defendant also maintains with respect to the execution of the warrant that in obtaining fingernail scrapings from his person the police went beyond the scope of the warrant, which authorized a search of defendant for: "Evidence * * * [such as] scratches, cuts, bruises, blood and hair to be found on the person of [defendant] * * * and any clothing of [defendant] containing such blood, hair, or evidence of a struggle." In the context of this case, defendant's construction of the warrant is hypertechnical.

Even assuming the warrant process was in any way flawed, the "public safety" exception articulated in *People v Krom* (61 NY2d 187) would give the procedures employed by the police acceptability because the circumstances were such then that the paramount concern of the police was that of finding a person who was missing and may have been in danger *(id.,* at 198-199, citing *People v Mitchell,* 39 NY2d 173, *cert denied* 426 US 953). This fact, coupled with defendant's cooperative attitude, negates the charge of misconduct on the part of the authorities.

Nor is there any substance to defendant's argument that his statements were involuntarily made. The testimony presented at the suppression hearing was conflicting, creating a credibility issue, resolution of which was for the trial court; it found, and the record bears out the court's conclusion, that defendant was totally unworthy of belief. The claim that *Dunaway*

*v New York* (442 US 200) is controlling also does not bear scrutiny. Defendant was told that he was free to go. This, added to the fact that his detention was in all respects legal, renders *Dunaway* inapposite.

As for the trial itself, where defendant's guilt was overwhelmingly established, defendant finds reversible error in the trial court's ruling permitting the prosecutor on redirect to elicit hearsay evidence of uncharged criminal acts and prior convictions. This claim is predicated upon questioning propounded by defense counsel on his cross-examination of a State Police investigator concerning a statement given by defendant after the body was found. The question in issue was "starting sentence by sentence. I'd like you to indicate to me where from your knowledge or information that there are lies in this statement." This question prompted the court to warn that defense counsel was "ready to open the door for [the District Attorney] to drive a Mack truck through". Counsel persisted and asked the investigator to proceed line by line through the statement and indicate whether he believed it was true or false. On redirect, the District Attorney then asked the investigator the reasons for the responses he had given. Over objection, the court allowed the questioning on the ground defendant had "opened the door"; extremely damaging statements concerning previous sex crimes and a virtually identical violent rape were brought out.

Defendant relies on *People v Melendez* (55 NY2d 445) in support of his argument. We find *Melendez* distinguishable in that the cross-examination involved herein was broader than that reviewed in *Melendez* for it was directed at challenging the veracity of the investigator's belief as to whether defendant's statements were true or false.

Finally, insofar as the reconstruction proceeding is concerned, *People v Hughes* (59 NY2d 523) has no applicability. The court reporter here was hypnotized not for the purpose of refreshing his memory as to the substance of the trial court's charge, but only in the hope that he might recall where he may have misplaced that portion of the transcript.

To the extent preserved, we have considered the other points raised by defendant and find them lacking in merit.

Judgment affirmed. Kane, J. P., Main, Casey, Yesawich, Jr., and Levine, JJ., concur.