# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

**411**

**KA 11-00150**

PRESENT: SCUDDER, P.J., SMITH, CENTRA, FAHEY, AND PERADOTTO, JJ.

---

THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,

V                                                     OPINION AND ORDER

SCOTT F. DOLL, DEFENDANT-APPELLANT.

---

LIPSITZ GREEN SCIME CAMBRIA, LLP, BUFFALO (TIMOTHY P. MURPHY OF COUNSEL), FOR DEFENDANT-APPELLANT.

LAWRENCE FRIEDMAN, DISTRICT ATTORNEY, BATAVIA (WILLIAM G. ZICKL OF COUNSEL), FOR RESPONDENT.

---------------------------------------------------------------------------------------------------

Appeal from a judgment of the Genesee County Court (Robert C. Noonan, J.), rendered July 2, 2010.  The judgment convicted defendant, upon a jury verdict, of murder in the second degree.

It is hereby ORDERED that the judgment so appealed from is affirmed.

Opinion by SMITH, J.:  This appeal requires, inter alia, that we determine whether County Court properly denied defendant's motion to suppress statements that he made, including those he made to law enforcement agents when they questioned him in the absence of *Miranda* warnings and after he invoked the right to counsel.  Under the unique circumstances presented, we conclude that the Genesee County Sheriff's Deputies (hereafter, deputies) did not violate defendant's rights by detaining and questioning him until they discovered the victim's body.

I

After a Genesee County grand jury issued an indictment charging defendant with murder in the second degree (Penal Law § 125.25 [1] [intentional murder]), he moved, inter alia, to suppress statements he made to the deputies and others prior to his arrest, as well as certain tangible evidence.  The evidence at the suppression hearing establishes that, at approximately 8:51 in the evening of February 16, 2009, Genesee County Sheriff's Deputy James Diehl responded to a 911 telephone call regarding a suspicious person.  The caller indicated that the person was wearing a one-piece camouflage suit and a white hood, and that he was walking near a certain intersection.  Diehl stopped his patrol vehicle when he observed defendant, who fit the description, walking a short distance from that intersection.  As defendant approached Diehl's patrol vehicle, he dropped a metal object that Diehl later discovered to be a car jack.  Diehl nodded toward a

cylindrical object in defendant's pocket, and defendant displayed the object, which was a lug wrench.

Diehl observed what appeared to be wet blood stains on the knees and thighs of defendant's camouflage suit, and on defendant's sneakers and hands. At that point, Diehl requested identification, and defendant complied. When Diehl asked defendant what he was doing, defendant responded that he was walking in order to lower his cholesterol because he had a doctor's appointment the next morning. Defendant also said that he was going to a friend's house nearby, that he had dropped a car off at a local auction house and decided to stop and walk on the way back home, and that he lived in Corfu. In addition to the internal inconsistences in defendant's statements, Diehl knew that defendant's description of the location of the friend's house was inconsistent with the streets at issue.

While Diehl was assessing the situation, defendant asked for a ride back to his van. Diehl agreed and allowed defendant to sit in the back of the patrol vehicle. Before Diehl began driving, however, the witness who originally made the 911 telephone call approached Diehl's patrol car and told Diehl that he had seen defendant at a garage at the described intersection. The witness also told Diehl that defendant first turned away as the witness drove by, and then crouched down between two cars. Diehl told defendant that he was going to detain defendant until he could sort out the situation. Diehl then removed defendant from the patrol vehicle, frisked and handcuffed him, and returned him to the back seat. Diehl asked defendant about the blood on his clothing, and defendant replied that it was cold out so he put on the coveralls that he wore when he butchered deer.

Diehl drove to the location where defendant parked his van. Diehl observed blood in several places on both the inside and outside of the van, and on the ground next to the van. He also observed a pair of gloves, which appeared to be blood-soaked, on top of a car near the van. Other deputies arrived and noticed several additional blood spots on defendant's face, and questioned him about the blood. Defendant initially told Deputy Patrick Reeves that the blood was old, but Reeves observed that it was fresh. Reeves removed defendant from the patrol vehicle and showed him the blood on and near the van, and Reeves also pointed out that defendant's sneakers were leaving bloody footprints in the snow. Reeves and other deputies asked defendant whether the blood was human or deer blood, and indicated that they would let him go if he could show them the deer. Defendant repeatedly stated, however, that he could not take the deputies to a deer nor could he explain the source of the blood. Although defendant invoked his right to counsel, the deputies thought that there had been an accident or assault that resulted in injuries, and that "somebody may be in need." They therefore continued to ask defendant whether someone was in need of medical attention, and about the source of the blood on his clothing and at the scene. Defendant continued to indicate that he could not answer their questions. The People concede that the deputies did not administer *Miranda* warnings to defendant.

In addition to questioning defendant about the source of the blood, the deputies also took steps to locate the possible victim or victims. Deputies contacted or visited all of defendant's friends and relatives whose locations they could ascertain, to check on their welfare, and the deputies asked police officers in Akron, New York, to check on defendant's ex-wife. In addition, deputies contacted the owner of the business where the van was located, and attempted to contact others who might have information concerning the situation confronting them. Deputies walked on both sides of the road between the location where the van was parked and where defendant was found, searching for any injured person. When deputies went to the home of defendant's business partner, they found his body lying on the ground in the driveway.

After the victim's body was located, defendant's girlfriend arrived at the Sheriff's office with another woman. The other woman was defendant's friend, and they had previously worked together as correctional officers at a state correctional facility. Defendant's friend repeatedly asked the deputies if she could speak with defendant, and eventually Sheriff's Investigator Kristopher Kautz agreed to permit her to do so, but told her that any conversation was not at Kautz' request. Kautz also indicated that he was going to remain in the room while defendant spoke with his friend and that, although Kautz would not take part in their conversation, he would take notes regarding it. During the ensuing conversation, defendant told his friend that the situation did not involve an animal, that he had been "present" but did not do anything, that it was an open and shut case, that he was going to be in jail somewhere, and that he guessed that he would get what he deserved. Defendant's friend specifically asked defendant to tell her that there was not a dead body, and defendant replied, "I can't do that." Kautz stayed in the room during the conversation, standing a few feet from defendant and his friend, within defendant's view.

Before finding the victim's body, deputies took photographs of defendant and his clothing, obtained a buccal swab from defendant for DNA testing, and towed his van to a Sheriff's facility to preserve the blood evidence. Although the record indicates that the deputies seized defendant's clothing, it does not clearly establish whether that seizure occurred before or after the victim's body was found. Pursuant to several search warrants, the deputies later seized the records from the business of defendant and the victim, bank records relating to that business, and other evidence.

Defendant moved, inter alia, to suppress the statements that he made to the deputies and to his friend, and also sought suppression of his clothing, the van, the buccal swab, another swab taken from the blood found on defendant's face, the evidence seized pursuant to the warrants, and all other evidence derived from that evidence. After conducting a hearing, the court suppressed the buccal swab and the results of any testing performed upon it, but denied the remainder of defendant's suppression motion. In an order entered upon defendant's consent, the court later directed that defendant provide a sample of his DNA.

     At trial, in addition to the evidence adduced at the suppression
hearing, the People introduced evidence establishing that the victim's
DNA was consistent with the DNA in the blood found on defendant's
clothing, the van, and the gloves.  The DNA in the swab taken from
defendant's face was consistent with being a mixture of his DNA and
the victim's DNA.  A jury convicted defendant of murder in the second
degree, and he appeals.

                                    II

     Contrary to defendant's contention, the court properly denied his
motion to suppress the statements that he made to the police and to
his friend while in police custody.  Although defendant is correct
that the police continued to question him in the absence of *Miranda*
warnings and after he requested an attorney, we conclude that the
continued questioning was permitted pursuant to the emergency doctrine
in these circumstances.

     Initially, we reject the contention of the People that defendant
was not in custody and that *Miranda* warnings therefore were not
required.  The evidence establishes that the deputies informed
defendant that he would not be released until they were able to
ascertain the source of the blood.  In addition, defendant was frisked
and kept in handcuffs while the deputies attempted to locate the
injured person.  A reasonable person under those circumstances would
not have felt free to leave, and thus the court properly concluded
that defendant was in custody for *Miranda* purposes (*see People v
Mejia*, 64 AD3d 1144, 1145-1146, *lv denied* 13 NY3d 861; *People v
Rhodes*, 49 AD3d 668, 668-669, *lv denied* 10 NY3d 938; *see generally
People v Yukl*, 25 NY2d 585, 589, *cert denied* 400 US 851).

     We agree, however, with the People's further contention that the
deputies did not violate defendant's right to counsel or his *Miranda*
rights under the unique circumstances of this case.  The amount of
blood present on defendant's face, hands, clothing and van, and on the
ground, along with the bloody gloves on top of a nearby car, indicated
that one or more persons had been grievously injured, and that
defendant had been in close contact with that person or persons.
Defendant's initial explanation, that he had just put on clothing in
which he sometimes butchered deer, was inconsistent with the fresh,
wet blood on his clothing, as well as with the blood on his hands and
face.  Defendant added to the suspicious nature of the circumstances
by refusing to show the deputies any deer or deer meat that could be
the source of the blood, and by refusing to answer their questions
concerning whether a person was involved.  Based upon the
circumstances confronting the deputies, they were justified in
concluding that one or more persons had been injured and were in need
of assistance or rescue.

     The need to gain information about a possibly injured victim or
victims permitted the deputies to continue questioning defendant,
despite his request for an attorney, under the doctrine that is
variously known as the rescue, emergency, or public safety doctrine.
"Under New York's emergency exception, police officers can continue to

question a defendant even after the defendant has requested an attorney if an individual's life or safety is at stake" (*People v Kimes*, 37 AD3d 1, 16, *lv denied* 8 NY3d 881, *rearg denied* 9 NY3d 846). In a case involving police questioning of a suspect concerning the whereabouts of a kidnapping victim, the Court of Appeals wrote:

> "It would not be reasonable or realistic to expect the police to refrain from pursuing the most obvious, and perhaps the only source of information by questioning the kidnapper, simply because the kidnapper asserted the right to counsel after being taken into custody.  To hold that the special restrictions of the State right to counsel rule extend into this area of police activity would . . . dangerously limit the power of the police to find and possibly rescue the victim . . . We therefore hold that the police did not violate the defendant's right to counsel under the State Constitution by questioning him concerning the victim's whereabouts" (*People v Krom*, 61 NY2d 187, 200).

Although police officers "do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception" (*Michigan v Fisher*, ___ US ___, ___, 130 S Ct 546, 549), such ironclad proof existed here.  The deputies possessed specific information establishing that one or more persons had been injured to the point where he, she or they had lost a significant amount of blood.  Consequently, the deputies did not violate defendant's right to counsel by continuing to question him despite his request for an attorney.

We respectfully disagree with the dissent's conclusion that the exception does not apply because the deputies lacked knowledge that there was a victim, such as the kidnapped victim in *Kimes* (37 AD3d 1). The deputies did not know the name of the victim or victims, but they possessed enough information about his/her/their condition to justify the continued questioning of defendant despite his request for an attorney.  Based on defendant's responses to their questions regarding deer, the deputies were justified in concluding that the blood came from a person rather than from an animal.  Therefore, they knew that there was at least one victim, who had lost a significant amount of blood.  The amount of blood located on defendant's clothing, sneakers, face, hands, and the inside and outside of his van, along with the blood on the snow and the gloves, established the existence of a victim or victims who had been seriously injured.  In addition, the deputies knew from the blood on defendant that he had been very close to the victim or victims.  Furthermore, his refusal to answer questions and his patently false statements were evidence that defendant was withholding essential information and knowledge concerning the victim's or victims' whereabouts.  Thus, contrary to the conclusion of the dissent, the deputies knew that there was a victim, to wit, at least one person who had been seriously injured and needed assistance.

Similarly, "[g]iven the legitimate concern of the police for the safety of [any] victim, the questioning of the defendant regarding [any] victim's identity and whereabouts, without first advising him of his *Miranda* rights . . . , was lawful" (*People v Boyd*, 3 AD3d 535, 536, *lv denied* 2 NY3d 737; *see People v Molina*, 248 AD2d 489, 490, *lv denied* 92 NY2d 902). It is well settled that law enforcement agents may question a suspect without administering *Miranda* warnings in order to ensure the safety of people who might, in the future, be injured by a handgun that the suspect had abandoned in a public place (*see New York v Quarles*, 467 US 649, 651; *People v Chestnut*, 51 NY2d 14, 22-23, *cert denied* 449 US 1018; *People v Oquendo*, 252 AD2d 312, 314-315, *lv denied* 93 NY2d 901). In analogizing the exigent circumstances exception to the Fifth Amendment to the similar exception to the Fourth Amendment's protection against unreasonable searches, the United States Supreme Court wrote that a factual scenario in which a suspect known to have discarded a handgun shortly before his apprehension "present[ed] a situation where concern for public safety must be paramount to adherence to the literal language of the prophylactic rules enunciated in [*Miranda*]" (*Quarles*, 467 US at 653). The Supreme Court concluded that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination" (*id.* at 657). Given the far more immediate and heightened concern arising from this situation, in which the evidence established that one or more persons had sustained severe injuries, the same rule applies. The deputies, rightfully concerned that a life might hang in the balance, did not violate defendant's rights by continuing to question him without administering *Miranda* warnings (*see People v Zalevsky*, 82 AD3d 1136, 1138).

Contrary to defendant's further contention, suppression of his statements was not required because the deputies who questioned him were also attempting to obtain evidence in order to convict him of a crime. "Applicability of the 'public safety' exception does not depend on the officers' motivations. As long as there is an objective need to ask the questions in order to protect the public, it does not matter that the officers may also have desired to obtain incriminating evidence" (*Oquendo*, 252 AD2d at 315; *see Quarles*, 467 US at 655-656). Here, it is clear that the deputies were pursuing every possible avenue in their attempts to locate the victim or victims. In addition to questioning defendant, the deputies went to the homes of his family and friends, both to seek information and to check on the condition of those people. As noted, the deputies also searched the roadside near where defendant was apprehended, and they searched the surrounding countryside. A deputy contacted the police in the Town of Akron, where defendant's ex-wife resided, and asked officers there to check on her condition, to ensure that she was not the person who had been injured. Inasmuch as the evidence at the suppression hearing established that an objective need to rescue a member of the public existed and that the deputies were doing everything possible to aid that person or persons, the emergency exception applied notwithstanding the deputies' additional intent to obtain incriminating evidence.

III

We also reject defendant's further contention that the court erred in refusing to suppress the statements he made to his friend after the victim's body was discovered. Defendant is correct that, "[o]nce the [deputies] found the victim's body . . . and ascertained that []he was dead, and after that information was communicated to the [deputies] questioning the defendant, the emergency no longer existed" (*Zalevsky*, 82 AD3d at 1138). With respect to the statements made by defendant to his friend, however, we conclude that defendant's right to counsel was not implicated.

> "Central to the scope of the right of counsel is the involvement of the State in eliciting that evidence. The right to counsel does not clothe an accused with absolute immunity as to all incriminating statements made outside the presence of a lawyer. While the right to counsel guarantees that an accused will have a competent advocate in confronting the power of the State, that protection does not extend to encounters with private citizens absent collusion of the State . . . [Thus,] statements induced by nongovernmental entities, acting privately, do not fall within the ambit of this exclusionary rule" (*People v Velasquez*, 68 NY2d 533, 537).

Defendant's contention that his friend was acting on behalf of or in collusion with law enforcement agents is without merit. In determining whether a private actor is acting on behalf of or in collusion with law enforcement agents such as the police officers or deputy sheriffs involved here, a court must examine numerous factors, including whether the circumstances establish "a clear connection between the police and the private investigation . . . ; completion of the private act at the instigation of the police . . . ; close supervision of the private conduct by the police . . . ; and a private act undertaken on behalf of the police to further a police objective" (*People v Ray*, 65 NY2d 282, 286). A review of those factors establishes that, "according to the evidence at the suppression hearing, defendant's [friend] was not acting as an agent of the [deputies], and [his] statements were not otherwise induced by governmental entities" (*People v Carvalho*, 60 AD3d 1394, 1395, *lv denied* 13 NY3d 742). Consequently, the court properly refused to suppress those statements (*see People v Jean*, 13 AD3d 466, 467, *lv denied* 5 NY3d 764, 807; *People v Ross*, 122 AD2d 538, 539, *lv denied* 68 NY2d 816; *cf. People v Grainger*, 114 AD2d 285, 289). In any event, any error in admitting the statements that defendant made to his friend is harmless because he made similar statements to the deputies, which we have determined were properly admitted, and, "in light of the totality of the evidence, there is no reasonable possibility that the error affected the jury's verdict" (*People v Douglas*, 4 NY3d 777, 779; *see People v Lopez*, 16 NY3d 375, 386-387).

IV

Contrary to defendant's further contention that he was de facto arrested without probable cause, we conclude that the deputies' actions were at all times in compliance with the four-tier analysis set forth in *People v De Bour* (40 NY2d 210, 223; *see People v Moore*, 6 NY3d 496, 498-499; *People v Hollman*, 79 NY2d 181, 184-185). The evidence at the suppression hearing establishes that Diehl stopped his vehicle and defendant walked to the vehicle of his own accord, at which time the deputy nodded toward the cylindrical object protruding from defendant's pocket and asked defendant what he was doing. These were merely non-threatening questions not indicative of criminality, and thus were justified as a level one inquiry (*see Hollman*, 79 NY2d at 185). The observation of fresh blood stains on defendant's hands and clothing gave the deputy a "founded suspicion that criminal activity [was] afoot" (*De Bour*, 40 NY2d at 223), which justified a more pointed inquiry into his activities as a level two intrusion.

We reject defendant's contention that his detention in handcuffs was a de facto arrest requiring probable cause; rather, we conclude that the detention was a level three intrusion, requiring reasonable suspicion. "Reasonable suspicion represents that 'quantum of knowledge sufficient to induce an ordinarily prudent and cautious [person] under the circumstances to believe criminal activity is at hand' " (*People v Martinez*, 80 NY2d 444, 448, quoting *People v Cantor*, 36 NY2d 106, 112-113). Here, Diehl was informed by a citizen that defendant had been attempting to conceal himself, and defendant provided varying and incredible explanations of his conduct in response to Diehl's inquiries. Diehl also observed blood on defendant's clothing and person, and defendant's explanation for the presence of the blood was patently false. Consequently, the deputy properly concluded that defendant had committed a felony or a misdemeanor, which provided reasonable suspicion to detain him (*see Moore*, 6 NY3d at 498-499). We further reject defendant's contention that he was de facto placed under arrest when the deputies seized his clothing. Although the record does not clearly establish the exact time of that seizure, the record does establish that it occurred after he was handcuffed. Therefore, the deputies had reasonable suspicion that criminal activity was afoot at that time, justifying the level three continuing temporary detention of defendant while they attempted to locate the victim or victims.

Defendant's contention that the deputies were only permitted to detain him briefly while they searched the immediate area for a victim is without merit. An emergency that unquestionably threatened the life of a victim or victims existed, as discussed above, and defendant provided the deputies with the best avenue of attempting to provide assistance to such victim or victims. In this contention, defendant relies upon his Fourth Amendment rights. The emergency doctrine provides an exception to those rights when the law enforcement agents involved are confronted with an immediate need to provide aid or assistance to a possibly injured individual (*see People v Molnar*, 288 AD2d 911, 911-912, *affd* 98 NY2d 328; *People v Mitchell*, 39 NY2d 173, 177-178, *cert denied* 426 US 953). Although it is not yet settled

whether, under the New York State Constitution, the rule in *Mitchell* will yield to the rule in *Brigham City, Utah v Stuart* (547 US 398; *see People v Dallas*, 8 NY3d 890, 891), the uncertainty is of no moment because the facts presented herein qualify as an emergency under either rule (*see People v Desmarat*, 38 AD3d 913, 914-915).  Thus, we deem the protection provided by the "Fourth Amendment inapplicable [because] the exigencies of the situation make the needs of law enforcement so compelling that the [detention] is objectively reasonable under the Fourth Amendment" (*Quarles*, 467 US at 653 n 3 [internal quotation marks omitted]; *see Mincey v Arizona*, 437 US 385, 393-394).

V

    We reject defendant's contention that the deputies seized his van without probable cause to believe that he committed a crime.  " 'If the police possess probable cause to believe the vehicle is the instrumentality of a crime and exigent circumstances exist, they may seize the [vehicle] without a warrant,' and both of those factors exist here" (*People v White*, 70 AD3d 1316, 1317, *lv denied* 14 NY3d 845; *see People v Sweezey*, 215 AD2d 910, 914, *lv denied* 85 NY2d 980).  The blood on the interior and exterior of the vehicle, by itself, provided reasonable cause to believe that the van was the instrumentality of a crime.  Furthermore, the fragile nature of the blood on the exterior of the van, which could be destroyed by mere rainfall or splashing water from ice and snow that melted, provided the exigent circumstances.

VI

    "A defendant seeking suppression of evidence has the burden of establishing standing by demonstrating a legitimate expectation of privacy in the premises or object searched" (*People v Ramirez-Portoreal*, 88 NY2d 99, 108), and defendant failed to establish such an expectation with respect to the seizure of the vehicles, as well as the business records of the corporation that he shared with the victim.  We have considered defendant's remaining contentions with respect to the basis for the search warrants and the issuance of the warrants themselves, and conclude that they are without merit.

VII

    Defendant's contention that the court abused its discretion in its *Molineux* and *Ventimiglia* rulings is without merit.  At trial, the court permitted the People to introduce evidence that defendant had used a vehicle owned by the victim as security for a loan that was made to the business.  The court also permitted the People to present evidence establishing that defendant used a vehicle that the business had sold as security for another loan, and later borrowed that vehicle from the owner to defraud the lender into believing that the business still owned the vehicle.  "Here, evidence regarding defendant's prior [business] activities not only provided necessary background information and explained the relationship between defendant and the victim, but also . . . [helped to] establish[ ] defendant's motive for

killing the victim" (*People v Burnell*, 89 AD3d 1118, 1120-1121, *lv
denied* 18 NY3d 922).

     Defendant made only a general motion for a trial order of
dismissal, and he therefore failed to preserve for our review his
contention that the evidence is legally insufficient to support the
conviction (*see People v Gray*, 86 NY2d 10, 19; *see also People v
Martinez*, 73 AD3d 1432, 1432-1433, *lv denied* 15 NY3d 807).
Furthermore, viewing the evidence in light of the elements of the
crime as charged to the jury (*see People v Danielson*, 9 NY3d 342,
349), we reject defendant's contention that the verdict is against the
weight of the evidence (*see generally People v Bleakley*, 69 NY2d 490,
495).

     Finally, defendant failed to preserve for our review his
contention that the prosecutor's summation shifted the burden of proof
to the defense and thereby deprived him of a fair trial (*see People v
Anzalone*, 70 AD3d 1486, 1487, *lv denied* 14 NY3d 885; *see generally
People v Romero*, 7 NY3d 911, 912).  In any event, that contention
lacks merit inasmuch as the allegedly improper comments by the
prosecutor were fair comment on the evidence (*see People v Anderson*,
52 AD3d 1320, 1321, *lv denied* 11 NY3d 733; *People v Coleman*, 32 AD3d
1239, 1240, *lv denied* 8 NY3d 844).  Furthermore, even assuming,
arguendo, that any of the comments were improper, we conclude that
they did not deprive defendant of a fair trial inasmuch as "the court
clearly and unequivocally instructed the jury that the burden of proof
on all issues [with respect to the crime charged] remained with the
prosecution" (*People v Pepe*, 259 AD2d 949, 950, *lv denied* 93 NY2d
1024; *see People v Matthews*, 27 AD3d 1115, 1116).

                                VIII

     We have considered defendant's remaining contentions, and
conclude that they are without merit.  Accordingly, we conclude that
the judgment should be affirmed.

     SCUDDER, P.J., and PERADOTTO, J., concur with SMITH, J.; CENTRA, J.,
dissents and votes to reverse in accordance with the following Opinion
in which FAHEY, J., concurs:  We respectfully dissent, inasmuch as we
disagree with the majority that the emergency exception applies in
this case.  We therefore conclude that the judgment should be
reversed, defendant's statements that he made to the police should be
suppressed, and a new trial should be granted.

     The evidence at the suppression hearing established that a
sheriff's deputy approached defendant at around 8:45 p.m. as he was
walking along a road wearing camouflage clothing; defendant matched
the description of a "suspicious" person who had been seen crouching
between parked vehicles.  Defendant had blood on his clothing, the
presence of which he explained by stating that he butchers deer.
After the citizen informants identified defendant as the suspicious
person they had seen, the deputy handcuffed defendant and placed him
in the back of the police vehicle.  Not satisfied with defendant's

answers to his questions, the deputy informed defendant that he was being detained until the deputy could figure out what happened, and he was interrogated for the next several hours by several sheriff's deputies without *Miranda* warnings and despite his request for counsel. At around 1:30 a.m., a body was found and defendant was formally arrested. Thereafter, defendant's friend was allowed to speak with defendant in the presence of the police, and defendant made additional incriminating statements to her. County Court denied that part of defendant's motion seeking to suppress his statements to the police, concluding that the emergency exception applied to justify the police interrogation of defendant without counsel or *Miranda* warnings. The court further denied that part of defendant's motion seeking to suppress his statements to his friend because she was not an agent of the police.

In *People v Krom* (61 NY2d 187, 198-200), the Court of Appeals established the emergency exception that allows the police to question a suspect in custody despite the suspect's request for an attorney. In that case, the police were searching for a victim who had been kidnapped and questioned the defendant, the suspected kidnapper (*id.* at 192-195). The Court held that it was permissible for the police to question the defendant in the absence of counsel because they were attempting to locate the victim (*id.* at 199-200; *see People v Kimes*, 37 AD3d 1, 16, *lv denied* 8 NY3d 881, *rearg denied* 9 NY3d 846 [permissible to question the defendant even after she requested an attorney because an "individual's life or safety (was) at stake"]). The facts of this case, however, are very different from *Krom* and do not warrant the application of the emergency exception. Most importantly, unlike in *Krom*, the police in this case were not aware that there was even a victim who needed police assistance. While we agree with the majority that the police did not need to know the victim's identity (*see e.g. People v Boyd*, 3 AD3d 535, 536, *lv denied* 2 NY3d 737), they at least had to know that there was a victim of a crime. The majority relies on the fact that the defendant had blood on his clothes to support the inference that there was a victim somewhere, but defendant explained that the blood on his clothes was from butchering deer, which is certainly a reasonable explanation. To allow the police to disregard a person's invocation of the right to counsel based on the mere fact that the person has blood on his or her clothing is an unwarranted expansion of the emergency exception.

We agree with the majority, however, that defendant's statements that he made to his friend in the presence of the police were admissible. Although those statements were made after the emergency had ceased, the court properly determined that the friend was not acting as an agent of the police.

Accordingly, we would reverse the judgment, grant only that part of defendant's motion seeking to suppress his statements to the police, and grant a new trial. We otherwise concur with the majority on the remaining issues.

Entered: July 6, 2012

Frances E. Cafarell
Clerk of the Court