Egan Jr., J.
Appeal from a judgment of the County Court of Broome County (Smith, J.), rendered December 2, 2010, upon a verdict convicting defendant of the crimes of manslaughter in the first degree and criminal trespass in the second degree.
At 4:24 a.m. on June 27, 2009, Kelly Wescott (hereinafter the victim) placed a 911 call indicating that defendant — her boyfriend — had kicked down the door to her apartment in the Village of Johnson City, Broome County and was refusing to leave. When a police officer arrived, he observed that the door frame and surrounding molding was damaged; defendant, however, was nowhere to be found. The victim declined to press charges, and the officer, who was scheduled to end his tour at 6:40 a.m., left the premises and briefed the next shift regarding the incident. Before doing so, the officer — noting that the damaged door was not “all that secure” — suggested that the victim prop a kitchen chair underneath the door knob “for extra security.”
*934 At 7:41 a.m., patrol officer Todd Haven was dispatched to defendant’s residence — also located in Johnson City — in response to a welfare complaint regarding defendant’s two daughters. While en route, Haven was advised that dispatch had received a telephone call from defendant’s brother indicating that defendant “was making statements that he [had] just killed his girlfriend.” Fellow officer Michael Mason also was assigned to the call. Upon arrival, defendant’s brother admitted Haven and Mason to the residence,[1] at which time they observed defendant sitting on a love seat drinking a beer. As the officers approached, defendant turned to one of his daughters and stated, “[T]his [will] be [my] last drink.” Haven, who recognized defendant, then said, “[H]ey, Billy, what’s going on,” in response to which defendant indicated that “he [had] killed his girlfriend.” Specifically, defendant stated, “[We] were having wild sex and she pissed me off and I killed the f......whore.”
Haven was aware of the earlier incident at the victim’s apartment and, in an effort to clarify the situation, asked defendant whether the event to which he was referring occurred before or after the victim’s prior 911 call. When defendant indicated that this incident occurred after the victim’s 911 call, Haven stepped outside and advised dispatch to send officers to the victim’s residence to check on her welfare. Mason then posed a similar question (“[W]hen did this . . . take place?”) to defendant, who stated that the incident occurred “last night.” Pending notification of the victim’s status, Haven and Mason handcuffed defendant and placed him in the back of Haven’s patrol car. Mason stood outside the patrol vehicle to keep an eye on defendant, and Haven went back inside the residence to secure the scene. Defendant continued to make incriminating statements — both as he walked to and once he was inside of the patrol vehicle— the latter of which were captured by the vehicle’s surveillance camera, which Mason activated shortly after placing defendant inside.
In the interim, officers were dispatched to the victim’s residence. As the officers knocked on the door to the apartment, the door opened on its own, at which time they observed pieces of the broken door molding mixed with the remnants of a broken *935 chair on the floor of the residence.[2] The officers then proceeded to the rear of the apartment, where they discovered the victim’s body lying on a bed. Shortly after 9:00 a.m., defendant was transported to the local police station where — after being advised of his Miranda rights — he continued to make various statements. A subsequent autopsy disclosed that the victim’s death resulted from “asphyxiation due to smothering.”
Defendant subsequently was indicted and charged with murder in the second degree and criminal trespass in the second degree. Following a jury trial, defendant was convicted of the lesser included offense of manslaughter in the first degree and criminal trespass in the second degree. At the conclusion of a lengthy sentencing hearing, defendant was sentenced as a persistent felony offender to concurrent terms of one year for the criminal trespass conviction and 25 years to life for the manslaughter conviction. Defendant now appeals.
We affirm. Initially, we reject defendant’s assertion that County Court erred in failing to suppress his various statements made to law enforcement officials. “[T]he safeguards required by Miranda are not triggered unless a suspect is subject to custodial interrogation” (People v Lewis, 83 AD3d 1206, 1207 [2011], lv denied 17 NY3d 797 [2011] [internal quotation marks and citation omitted]). Here, defendant was not in custody when Haven and Mason initially spoke with him at his residence, and defendant’s statements — made in response to the brief investigatory questions posed by the officers in an effort to clarify precisely what had transpired — were not the product of a custodial interrogation (see People v Smith, 89 AD3d 1126, 1127 [2011], lv denied 18 NY3d 962 [2012]; People v Cordato, 85 AD3d 1304, 1309 [2011], lv denied 17 NY3d 815 [2011]; People v Steinhilber, 48 AD3d 958, 959 [2008], lv denied 10 NY3d 871 [2008]; People v Brand, 13 AD3d 820, 822 [2004], lv denied 4 NY3d 851 [2005]; cf. People v Hayes, 60 AD3d 1097, 1100-1101 [2009], lv denied 12 NY3d 925 [2009]; People v Butcher, 38 AD3d 942, 943 [2007], lv denied 9 NY3d 841 [2007]; People v Baker, 27 AD3d 887, 888 [2006]).[3] Hence, suppression of those statements was not warranted.
*936 As for the statements made by defendant once he was handcuffed and escorted to/placed in Haven’s patrol vehicle, “spontaneous statements made while in custody which are not the product of questioning or its functional equivalent clearly are admissible regardless of whether Miranda warnings were given” (People v Starks, 37 AD3d 863, 864 [2007] [internal quotation marks and citations omitted]; accord People v Rabideau, 82 AD3d 1283, 1284 [2011], lv denied 17 NY3d 799 [2011]; see People v Henderson, 74 AD3d 1567, 1569 [2010], mod 77 AD3d 1168 [2010]; People v Scott, 47 AD3d 1016, 1019-1020 [2008], lv denied 10 NY3d 870 [2008]). Contrary to defendant’s assertion, Mason’s subsequent and occasional inquiries as to defendant’s welfare did not constitute interrogation.* [4] Finally, any statements made by defendant at the police station after he was advised of and waived his Miranda warnings clearly were not subject to suppression (see People v Culver, 69 AD3d 976, 977 [2010]; People v Mann, 41 AD3d 977, 979-980 [2007], lv denied 9 NY3d 924 [2007]). To the extent that defendant now suggests that he was too intoxicated to validly waive his Miranda rights, this argument — assuming it has been preserved for our review — is belied by the testimony adduced at the suppression hearing (see People v Smith, 89 AD3d at 1128; People v Scott, 47 AD3d at 1020). Accordingly, County Court properly denied defendant’s motion to suppress the challenged statements.
As for defendant’s request for a change of venue, defendant improperly brought his motion before County Court, rather than this Court (see CPL 230.20 [2]). Moreover, “because the motion was made prior to jury selection, it was premature” (People v Brockway, 255 AD2d 988, 988 [1998], lv denied 93 NY2d 967 [1999]), and the record does not reflect that defendant thereafter revisited the issue with County Court. Accordingly, this issue has not been preserved for our review (see People v Hardy, 38 AD3d 1169, 1169-1170 [2007], lv denied 9 NY3d 865 [2007]). Defendant’s related assertion — that County Court improperly denied three of his challenges for cause — is unavail *937 ing. Even assuming that County Court erred in this regard, defendant concedes that he did not exhaust all of his peremptory challenges during jury selection; therefore, any error in this regard would not warrant reversal (see People v Plaza, 60 AD3d 1153, 1154 [2009], lv denied 12 NY3d 919 [2009]; People v Doherty, 37 AD3d 859, 860 [2007], lv denied 9 NY3d 843 [2007]).
Defendant’s various challenges to County Court’s evidentiary rulings are equally unpersuasive. To the extent that defendant contends that the admission of the victim’s 911 call violated his constitutional right to confront the witnesses against him (see Crawford v Washington, 541 US 36 [2004]), we note that “[t]he statements on the tape were not testimonial, as their purpose was to enable the police to meet an ongoing emergency and apprehend the perpetrator, not to provide evidence for later prosecution” (People v Shaver, 86 AD3d 800, 802 [2011], lv denied 18 NY3d 962 [2012]; see Davis v Washington, 547 US 813, 822, 826-828 [2006]; People v Bradley, 8 NY3d 124, 127-128 [2006]). Under these circumstances, no Crawford violation occurred.
Nor are we persuaded that County Court erred in precluding testimony regarding defendant’s sexual practices with a former paramour, who purportedly would have testified that defendant “applied pressure to her neck in a choking fashion” for sexual pleasure. Although defendant had a constitutional right to present witnesses in his defense, that right was neither absolute nor unfettered, and County Court retained “wide latitude to exclude evidence that [was] repetitive, only marginally relevant, or pose[d] an undue risk of confusion of the issues” (People v Black, 90 AD3d 1066, 1067 [2011], lv denied 18 NY3d 992 [2012]; see People v Bowen, 67 AD3d 1022, 1023 [2009], lv denied 14 NY3d 769 [2010]). Upon reviewing defendant’s offer of proof and considering the context in which such testimony was sought, we cannot say that County Court abused its discretion in denying defendant’s request (compare People v Burkett, 101 AD3d 1468, 1470 [2012], lv denied 20 NY3d 1096 [2013]; People v Doyle, 48 AD3d 961, 963-964 [2008], lv denied 10 NY3d 862 [2008]). Defendant’s related claim — that he was prohibited from eliciting testimony regarding the victim’s physical strength and “feisty” nature when intoxicated — is belied by the record.
Defendant next contends that his manslaughter conviction is not supported by legally sufficient evidence and, further, is against the weight of the evidence. In this regard, a person is guilty of manslaughter in the first degree when he or she, with intent to cause serious physical injury to the victim, causes the victim’s death (see Penal Law § 125.20 [1]). The intent element “may be inferred from a defendant’s actions and [the] surround *938 ing circumstances” (People v Ford, 90 AD3d 1299, 1300 [2011], lv denied 18 NY3d 994 [2012]; see People v Molina, 79 AD3d 1371, 1376 [2010], lv denied 16 NY3d 861 [2011]).
James Terzian, the forensic pathologist who performed the victim’s autopsy, opined that the victim died from “asphyxiation due to smothering” — specifically, that someone “[m]ost probably” positioned himself or herself on top of the victim and applied pressure to the victim’s neck (utilizing the necklace she was wearing) and torso, thereby restricting her ability to breathe. According to Terzian, such pressure “would have [had] to continue for some period [of time] after [the victim became] unconscious . . . [i]n order for her to die.” Terzian’s opinion as to the cause of death was based upon, among other things, the blanching of the skin on the victim’s torso, the petechiae or micro hemorrhages observed on the victim’s face and lower extremities and the “very pronounced” groove on the victim’s neck that corresponded with her necklace. Despite the conflicting medical testimony offered by defendant’s forensic toxicologist, who noted the presence of cocaine and alcohol in the victim’s system (as had Terzian), and defendant’s forensic pathologist, who posited that the victim’s death could have resulted from positional asphyxiation or a fatal reaction to cocaine, we nonetheless conclude that the jury’s implicit finding as to the cause of death was supported by legally sufficient evidence and was not against the weight of the evidence (see e.g. People v Barreto, 64 AD3d 1046, 1048-1049 [2009], lv denied 13 NY3d 834 [2009]).
With respect to the identity of the perpetrator, defendant’s mother, who responded to defendant’s request for a ride home from the victim’s residence on the morning in question, testified that when defendant entered her vehicle, she noticed that his wrists were bleeding — apparently as the result of a failed suicide attempt.[5] Defendant thereafter variously informed members of his family, Haven and Mason — many of whom testified at trial — that he “might have killed [the victim],” that he “just killed [the victim]” and that he and the victim “were having wild sex and she pissed [him] off and [he] killed the f . . . . . . whore.” Defendant also was determined to be a “major contributor” to the DNA found in the drops of blood present on the victim’s shoulder, abdomen and pillowcase, and DNA taken from underneath defendant’s fingernails was “consistent” with a mixture of defendant’s and the victim’s DNA (see People v Thibeault, 73 AD3d 1237, 1240 [2010], lv denied 15 NY3d 810 *939 [2010] , cert denied 562 US —, 131 S Ct 1691 [2011]). In light of such proof, we are satisfied that defendant’s identity as the perpetrator is based upon legally sufficient evidence and is not against the weight of the evidence.
We reach a similar conclusion as to the element of intent. As noted previously, the police officer who responded to the victim’s 911 call advised her to position a kitchen chair underneath her door knob for added security, and a broken chair leg was found on the victim’s bed underneath her head — giving rise to the inference that the door to the victim’s residence was forcibly opened. Similarly, Terzian testified that, in order to cause the victim’s death, pressure had to have been applied to her neck and torso for some period of time after she lost consciousness. Such proof, coupled with defendant’s repeated statements that the victim had (or should not have) “pissed him off,” support the inference that defendant intended to cause the victim serious physical injury and — in so doing — caused her death (see e.g. People v Rogers, 94 AD3d 1246, 1250-1251 [2012], lv denied 19 NY3d 977 [2012]). To the extent that defendant argues that he was “extremely intoxicated at all relevant times,” we note that “[w]hether an individual’s level of intoxication negates the element of intent to commit a crime lies within the domain of the jury as the trier of fact” (People v Scott, 47 AD3d at 1018 [internal quotation marks and citations omitted]; cf. People v Burch, 45 AD3d 1188, 1189 [2007]). Upon our review of the record as a whole, “we cannot say that the jury improperly weighed the evidence in deciding in the People’s favor” on this point (People v Scott, 47 AD3d at 1019). Accordingly, we discern no basis upon which to disturb defendant’s conviction.
Nor are we persuaded that defendant was denied the effective assistance of counsel. In addition to making appropriate pretrial motions, including arguing for suppression of defendant’s various statements despite a limited likelihood of success, counsel advanced a viable and legitimate defense strategy — namely, that the victim had accidentally suffocated as a result of her drug use. To the extent that defendant faults counsel for failing to object to the autopsy photos of the victim, the photos, which were not particularly gruesome, not only illustrated material and disputed issues in the case, but arguably supported defendant’s theory that the victim’s body displayed scant signs of physical trauma in connection with her death (see People v Timmons, 78 AD3d 1241, 1244-1245 [2010], lv denied 16 NY3d 837 [2011] ; People v Thibeault, 73 AD3d at 1243; People v Ford, 43 AD3d 571, 574 [2007], lv denied 9 NY3d 1033 [2008]). Additionally, we fail to discern any prejudice to defendant resulting from *940 the brief delay occasioned by defense counsel’s successful request for an adjournment to enable defendant’s forensic pathologist, who apparently was retained after the trial was under way, to review certain pathology slides prior to testifying. Finally, defendant has failed to demonstrate that counsel’s decisions regarding certain aspects of the jury charge were anything other than strategic or tactical determinations, which this Court will not second-guess (see People v Shaver, 86 AD3d at 802; see also People v Jenkins, 90 AD3d 1326, 1330 [2011], lv denied 18 NY3d 958 [2012]). In short, as our review of the record reflects that counsel zealously represented defendant’s interests throughout the course of the trial by, among other things, making appropriate motions and objections, effectively cross-examining the People’s witnesses, advancing a plausible defense (despite overwhelming evidence of defendant’s guilt) and obtaining an acquittal on the top count of the indictment, we are satisfied that defendant was afforded meaningful representation (see People v O’Daniel, 105 AD3d 1144, 1147 [2013]; People v Thomas, 105 AD3d 1068, 1071-1072 [2013]; People v Jordan, 99 AD3d 1109, 1110-1111 [2012], lv denied 20 NY3d 1012 [2013]).
Defendant’s various jury-related challenges do not warrant extended discussion. Inasmuch as defendant voiced no objection to County Court’s response to the jury’s request for a read back of certain expert testimony, defendant’s present assertion — that County Court pressured the jury to accept a limited read back of the requested testimony — has not been preserved for our review (see People v Stevens, 216 AD2d 676, 679 [1995], lv denied 87 NY2d 908 [1995]; see also People v Jackson, 52 AD3d 1052, 1053-1054 [2008], lv denied 11 NY3d 789 [2008]) and, in any event, is lacking in merit. Defendant’s claim that County Court erred in failing to charge the jury as to the lesser included offense of criminally negligent homicide also is unavailing. County Court charged the jury as to manslaughter in the first degree and manslaughter in the second degree — both lesser included offenses of murder in the second degree — and the jury convicted defendant of manslaughter in the first degree. Under these circumstances, “defendant’s challenge to [County Court’s] refusal to charge criminally negligent homicide as a lesser-included offense of murder in the second degree is foreclosed by the jury’s verdict finding him guilty of manslaughter in the first degree, and its implicit rejection of the lesser-included offense of manslaughter in the second degree which had been submitted to it” (People v McGeachy, 74 AD3d 989, 989 [2010], lv denied 15 NY3d 853 [2010]; see People v Conroy, 102 AD3d 979, 981 [2013]; People v Burkett, 101 AD3d at 1472-1473; see also People v Green, 5 NY3d 538, 545 [2005]). Finally, we cannot say that *941 County Court erred in denying an individual juror’s request for a copy of the court’s written charge to the jury, as such request was made before the jury commenced deliberations and prior to any request by the jury for additional instructions (see CPL 310.30; cf. People v Townsend, 94 AD3d 1330, 1331-1332 [2012], lv denied 19 NY3d 1105 [2012]).
As for defendant’s claim that County Court erred in denying his respective motions to set aside the verdict pursuant to CPL 330.30 without a hearing, we disagree. The information provided by Shannon Shoemaker, which formed the basis for defendant’s November 2010 motion, was known to defendant prior to trial and, therefore, does not qualify as newly discovered evidence within the meaning of CPL 330.30 (3) (see People v Moyer, 75 AD3d 1004, 1007-1008 [2010]). With respect to defendant’s September 2010 motion, which was predicated upon hearsay allegations of juror misconduct purportedly relayed to defendant’s daughters (see CPL 330.30 [2]), we note that “[h]earsay allegations are insufficient to support a claim of juror misconduct” (People v Comfort, 30 AD3d 1069, 1069-1070 [2006], lv denied 7 NY3d 787 [2006]; see People v Covington, 44 AD3d 510, 510 [2007], lv denied 9 NY3d 1032 [2008]; see also People v Davis, 83 AD3d 1210, 1213 [2011], lv denied 17 NY3d 794 [2011]). Moreover, the daughters’ respective affidavits “failed to allege that the jury’s deliberative process was affected by an outside or improper influence, nor was the alleged impropriety sufficiently prejudicial as to require a new trial” (People v Gordon, 101 AD3d 1158, 1160 [2012], lv granted 21 NY3d 912 [2013]; see People v Covington, 44 AD3d at 511).
As a final matter, we find no merit to defendant’s various sentencing issues — including his assertion that County Court should have recused itself from presiding over his sentencing hearing. Absent legal disqualification (see Judiciary Law § 14), which defendant does not allege, “a [trial] judge is the sole arbiter of recusal and his or her decision, which lies within the personal conscience of the court, will not be disturbed absent an abuse of discretion” (Gonzalez v L’Oreal USA, Inc., 92 AD3d 1158, 1159 [2012] [internal quotation marks and citations omitted], lv dismissed 19 NY3d 874 [2012]; see People v Shultis, 61 AD3d 1116, 1117 [2009], lv denied 12 NY3d 929 [2009]). Our review of the record fails to disclose any evidence of judicial bias, and the fact that County Court previously presided over other criminal matters involving defendant did not warrant recusal here (cf. People v Lerario, 43 AD3d 492, 492-493 [2007]; People v Wallis, 24 AD3d 1029, 1031 [2005], lv denied 6 NY3d 854 [2006]; People v Caputo, 142 AD2d 888, 889 [1988]). Hence, *942 County Court’s denial of defendant’s recusal motion, which was made in the midst of the sentencing hearing, was not an abuse of discretion.
We reach a similar conclusion with respect to defendant’s request for a new attorney to represent him at sentencing. Given that four months elapsed between defendant’s conviction and the resulting sentencing hearing, we cannot say that County Court abused its discretion in failing to appoint assigned counsel for defendant at the start of the such hearing — particularly given that there is nothing in the record to suggest that defendant’s retained counsel, who zealously represented defendant throughout the course of the trial, “failed to handle the [sentencing] matter in a competent and professional manner” (People v Davis, 161 AD2d 787, 789 [1990], lv denied 76 NY2d 939 [1990]; see People v Rodriguez, 126 AD2d 580, 581 [1987], lv denied 69 NY2d 954 [1987]; compare People v Susankar, 34 AD3d 201, 202 [2006], lv denied 8 NY3d 849 [2007]; People v Jones, 15 AD3d 208, 209 [2005]).
Nor are we persuaded that the People failed to prove — beyond a reasonable doubt — that defendant qualified as a persistent felony offender within the meaning of Penal Law § 70.10 (1) (see CPL 400.20 [5]). The certificates of conviction documenting defendant’s conviction of vehicular manslaughter in the second degree in 1991, driving while intoxicated as a felony in 1996 and attempted robbery in the first degree in 1997 were sufficient to establish defendant’s status as a persistent felony offender (see People v Battease, 93 AD3d 888, 889 [2012], lv denied 18 NY3d 992 [2012]; People v Shaw, 83 AD3d 1101, 1102 [2011], lv denied 17 NY3d 801 [2011]; People v Chambers, 45 AD3d 465, 465 [2007], lv denied 10 NY3d 762 [2008]). Moreover, assuming that the related documentation provided by the People, i.e., fingerprint cards and various records maintained by the Department of Corrections and Community Supervision, was required, we are satisfied, based upon our review of the hearing transcript, that such materials were properly authenticated. Finally, nothing in the record before us suggests that County Court abused its discretion in concluding that “the history and character of . . . defendant and the nature and circumstances of his criminal conduct are such that extended incarceration and lifetime supervision of [him] are warranted to best serve the public interest” (CPL 400.20 [1] [b]), and we reject defendant’s assertion that the resulting sentence was harsh and excessive (see People v Battease, 93 AD3d at 889; People v Morey, 304 AD2d 855, 856-857 [2003], lv denied 100 NY2d 564 [2003]). Defendant’s remaining arguments, to the extent not specifically addressed, have been examined and found to be lacking in merit.
*943 Rose, J.P., Spain and McCarthy, JJ., concur. Ordered that the judgment is affirmed.

. The residence consisted of two apartments; defendant resided in the upstairs apartment, while his mother and certain other relatives resided in the downstairs apartment. The responding officers were admitted to the mother’s apartment, where defendant and members of his family were gathered.

. Two of the four chair legs were missing — one was found “a very short distance from the door” and the other was found “on the bed with [the victim,] underneath her head.”

. Notably, defendant’s brother testified that when defendant first told him that “[he] might have killed [the victim],” he “assumed [that defendant] was pulling [his] leg.” Even after defendant made a similar disclosure to his daughters, defendant’s brother testified that they still “didn’t really believe him.” Under these circumstances, Haven, who had been told that the victim *936 was alive approximately three hours earlier, hardly can be faulted for posing limited investigatory questions in an attempt to properly assess the situation unfolding before him.

. In response to defendant’s efforts to find a comfortable sitting position while handcuffed in the back of the patrol vehicle, Mason — after making various suggestions in this regard — inquired, “You’re good now?” Similarly, after defendant muttered, “This sucks,” Mason asked, “Are you alright?” When defendant answered, “No,” Mason then asked, “What’s wrong?” Simply put, such inquiries did not amount to custodial interrogation or its functional equivalent.

. Defendant had superficial cuts on his wrists, and a steak knife with his blood on it was found in his apartment.