[998 NE2d 384, 975 NYS2d 721]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SCOTT F. DOLL, Appellant.

Argued September 3, 2013; decided October 17, 2013

**POINTS OF COUNSEL**

*Lipsitz Green Scime Cambria, LLP*, Buffalo (*Timothy P. Murphy* and *Paul J. Cambria, Jr.*, of counsel), for appellant. I. Appellant was deprived of his state and federal constitutional rights to a fair trial, due process, counsel and to be free from compelled self-incrimination, as he invoked his right to counsel and was subjected to custodial interrogation without being afforded *Miranda* warnings. The public safety/emergency exception did not apply, and the statements were involuntarily made. (*People v Krom*, 61 NY2d 187; *Michigan v Fisher*, 558 US 45; *People v Rogers*, 48 NY2d 167; *People v West*, 81 NY2d 370; *People v Settles*, 46 NY2d 154; *People v Cunningham*, 49 NY2d 203; *People v Yukl*, 25 NY2d 585; *People v Samuels*, 49 NY2d 218; *People v Hobson*, 39 NY2d 479; *People v Parks*, 120 AD2d

920.) II. Appellant's state and federal constitutional rights to due process, a fair trial and to be free from unreasonable searches and seizures were violated by appellant's warrantless arrest and subsequent transport to the station, as there was no probable cause. (*Mapp v Ohio*, 367 US 643; *Wong Sun v United States*, 371 US 471; *People v De Bour*, 40 NY2d 210; *Dunaway v New York*, 442 US 200; *People v Bigelow*, 66 NY2d 417; *People v Hicks*, 68 NY2d 234; *People v Shulman*, 6 NY3d 1; *People v Cantor*, 36 NY2d 106; *People v Yukl*, 25 NY2d 585; *People v Ferry*, 152 AD2d 952.) III. Appellant's state and federal constitutional rights to due process, a fair trial and to be free from unreasonable searches and seizures were violated by law enforcement's pre-warrant search of the vehicle in appellant's possession and other physical evidence. Further, the subsequent warrants were not based upon probable cause. (*People v Rodriguez*, 69 NY2d 159; *People v Wesley*, 73 NY2d 351; *People v Ramirez-Portoreal*, 88 NY2d 99; *Payton v New York*, 445 US 573; *People v Bigelow*, 66 NY2d 417; *Johnson v United States*, 333 US 10; *People v Adams*, 53 NY2d 1; *People v Molnar*, 98 NY2d 328; *People v Wheeler*, 2 NY3d 370; *People v William II*, 98 NY2d 93.)

*Lawrence Friedman, District Attorney*, Batavia (*William G. Zickl* and *Melissa Lightcap Cianfrini* of counsel), for respondent. I. The statements made by defendant were properly admitted at trial. (*People v Dallas*, 8 NY3d 890; *People v Molnar*, 98 NY2d 328; *People v Tankleff*, 84 NY2d 992; *People v Bongarzone-Suarrcy*, 6 NY3d 787; *People v Harrison*, 82 NY2d 693; *People v Cardona*, 41 NY2d 333; *People v Hodge*, 44 NY2d 553; *People v Brewer*, 28 AD3d 265, 7 NY3d 753; *People v Desmarat*, 38 AD3d 913, 10 NY3d 933; *People v Rodriguez*, 77 AD3d 280, 15 NY3d 955.) II. The approach and detention of defendant were proper. (*People v Williams*, 17 NY3d 834; *People v Greenidge*, 91 NY2d 967; *Dunaway v New York*, 442 US 200; *People v Hicks*, 68 NY2d 234; *People v Robinson*, 282 AD2d 75; *People v Ryan*, 12 NY3d 28; *People v Hodge*, 44 NY2d 553; *People v McLaurin*, 70 NY2d 779; *People v Gomez*, 5 NY3d 416; *People v Oquendo*, 252 AD2d 312, 93 NY2d 901.)

## OPINION OF THE COURT

GRAFFEO, J.

The primary issue in this appeal is whether the courts below correctly concluded that the actions of the police were a reasonable response to a serious and ongoing exigent situation under the emergency doctrine.

I

At about 9:00 p.m. one evening in February 2009, the Genesee County Sheriff's Department received a 911 report of a suspicious person walking on a particular roadway. A deputy responded and observed a man who matched the description wearing a one-piece camouflage hunting outfit and a white hood. As the individual approached the officer's vehicle, he dropped a metal object and pulled a lug wrench from his pocket. The deputy observed what appeared to be wet blood stains on the man's knees, thighs, hands and shoes.

The officer asked the man for identification and he produced a correction officer identity card bearing his name—Scott Doll. Defendant Doll indicated that he was walking to lower his blood pressure because he had a doctor's appointment the next morning. He further explained that his van was parked near an automotive facility and he asked for a ride to that location. The deputy agreed to take defendant to his vehicle.

After defendant got into the rear seat of the police car, the firefighter who had placed the 911 call came to the scene and informed the deputy that when he had noticed defendant at the automotive garage, defendant had turned away from him and crouched between two cars in an attempt to avoid detection. Based on this information, the deputy told defendant that he was being detained until the situation was assessed. Defendant was then frisked and handcuffed. In response to a question about the blood on his clothes, defendant explained that he was wearing his deer butchering outfit because of the cold temperature that evening. He did not explain why the blood was wet.

The deputy drove defendant to his van and discovered blood in several places inside and outside defendant's vehicle, along with bloody gloves nearby. Other police officers who arrived at the scene noticed blood on defendant's face and saw him leave bloody footprints in the snow. Around this time, defendant asked to speak to his divorce lawyer. When the police questioned defendant about whether the blood was from a deer or a human, defendant declined to explain the source of the blood or take the deputies to the alleged butchered deer.

These unusual circumstances caused the deputies to believe that a person may have been injured in an accident or assault so they continued to question defendant despite his request for legal assistance. Defendant repeated that he could not answer the officers' inquiries. The police then tried to contact defendant's

relatives and acquaintances (as well as other individuals) to determine whether anyone needed emergency assistance. Officers also searched for an injured person in the vicinity where defendant had been walking. Eventually, police officers went to the residence of defendant's business partner and discovered the man lying dead in his driveway.

In the meantime, the police impounded defendant's van and took him to the sheriff's office. Defendant was photographed, tested for DNA and his clothes were seized. A few hours later, a female friend (a former coworker of defendant) arrived at the police station and asked to speak with defendant. An investigator, who was aware of the death of defendant's business partner, initially rebuffed the woman. He eventually allowed her to meet with defendant after explaining that he intended to remain in the room while they spoke and he would be taking notes but would not participate in the discussion. During the meeting, with the investigator only a few feet away, defendant told the woman that the case did not involve an animal; he had been present but did not do anything; the case was "open and shut" and he would be going to jail; and he would probably get what he deserved. When the woman specifically asked defendant to state that no one was dead, defendant responded "I can't tell you that."

The blood found on defendant's clothes, his van and the gloves was later matched to the victim. Further investigation revealed that defendant had financial difficulties that affected his business relationship with the deceased and the men had arranged to meet on the day the victim died.

Defendant was indicted for second-degree murder. He moved to suppress the statements he made to the police and his female acquaintance, as well as all of the physical evidence, primarily claiming that he had been arrested without probable cause and interrogated in violation of his right to counsel and without receiving *Miranda* warnings. County Court conducted an evidentiary hearing and ruled that the detention and questioning of defendant were justified under the emergency doctrine. The court did, however, suppress the results of defendant's DNA test because the police could have obtained a warrant. A jury subsequently convicted defendant of second-degree murder and he was sentenced to a prison term of 15 years to life.

The Appellate Division affirmed (98 AD3d 356 [4th Dept 2012]), determining that the police actions were warranted

because the authorities reasonably responded to an emergency situation. Two Justices dissented, believing that the emergency doctrine was unavailable since the police did not know whether an actual crime victim existed. A dissenter granted defendant leave to appeal (19 NY3d 1003 [2012]). We now affirm.

## II

Defendant maintains that his right to counsel and *Miranda* protections were violated because the emergency doctrine should not apply where the police did not know for certain if a crime had occurred or whether an injured person needed emergency aid. Consequently, defendant contends that his motion to suppress should have been granted and a new trial ordered. The People assert that the police properly relied on the emergency doctrine in light of the peculiar circumstances they confronted—a man walking along a public road covered in fresh blood for which no reasonable explanation was readily forthcoming. They argue that it is unnecessary for the police to have specific information that a person requires assistance so long as they reasonably believe that there is an exigent situation demanding their attention.

As a general rule, a person who is in custody cannot be questioned without first receiving *Miranda* warnings (*see e.g. People v Ramos*, 99 NY2d 27, 35 [2002]) or after the right to counsel attaches (*see e.g. People v Gibson*, 17 NY3d 757, 759 [2011]). There are exceptions to these principles, one of which is referred to as the "emergency doctrine" (*see e.g. Michigan v Fisher*, 558 US 45, 47 [2009]; *Brigham City v Stuart*, 547 US 398, 403 [2006]; *New York v Quarles*, 467 US 649, 655-656 [1984]; *People v Molnar*, 98 NY2d 328, 331-333 [2002]; *People v Krom*, 61 NY2d 187, 198-200 [1984]; *People v Mitchell*, 39 NY2d 173, 177-178 [1976]). It recognizes that the Constitution "is not a barrier to a police officer seeking to help someone in immediate danger" (*People v Molnar*, 98 NY2d at 331), thereby excusing or justifying otherwise impermissible police conduct that is an objectively reasonable response to an apparently exigent situation (*see Brigham City v Stuart*, 547 US at 404-405). We have explained that the exception is comprised of three elements: (1) the police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property and this belief must be grounded in empirical facts; (2) the search must not be primarily motivated by an intent to arrest and seize evidence; and

(3) there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched (*see People v Molnar*, 98 NY2d at 332; *People v Mitchell*, 39 NY2d at 177-178).* The applicability of the emergency doctrine is a mixed question of law and fact that is beyond our review if the record supports the findings of the courts below (*see People v McBride*, 14 NY3d at 446; *People v Dallas*, 8 NY3d at 891; *People v Molnar*, 98 NY2d at 335).

▮ Here, we conclude that there is support in the record for the determination that the emergency doctrine justified the police questioning. Specifically, the police officers responding to a 911 call found defendant walking along a public road covered in fresh, wet blood and their reasonable inquiries regarding the source of the blood were met with inconsistent responses by defendant, who refused to state whether the blood was from a human or an animal. Under these circumstances, it was reasonable for the police to believe that a person may have been seriously injured and in need of imminent emergency assistance. Contrary to defendant's contention, the fact that police did not know definitively whether a crime had occurred or the identity of the potential victim was not dispositive because the emergency doctrine is premised on reasonableness, not certitude (*see People v Molnar*, 98 NY2d at 334-335 [the emergency doctrine allowed the police to conduct a warrantless residential entry without knowing if a crime had taken place inside]; *see e.g. Brigham City v Stuart*, 547 US at 404; *Michigan v Fisher*, 558 US at 49). Hence, the courts below properly denied defendant's motion to suppress the statements he made to the police before the victim was discovered and any evidence that was derived from that information (*see generally People v Krom*, 61 NY2d at 200-201).

### III

Defendant also asserts that he was entitled to suppression of the custodial statements he made to his female acquaintance in the presence of a police investigator. According to defendant, the police used the woman in order to conduct the functional equivalent of a custodial interrogation. We disagree.

▮ The purpose of the *Miranda* rule is to "prevent[ ] government officials from using the coercive nature of confinement to

---

* Whether the second factor remains viable is an issue we need not resolve in this appeal (*see e.g. People v McBride*, 14 NY3d 440, 447 n [2010]; *People v Dallas*, 8 NY3d 890, 891 [2007]).

extract confessions that would not be given in an unrestrained environment" (*Arizona v Mauro*, 481 US 520, 529-530 [1987]). New York's indelible right to counsel is likewise designed to prevent the police from attempting to elicit an uncounseled waiver of the right to remain silent (*see generally People v Lopez*, 16 NY3d 375, 381-382 [2011]). On this record, it cannot be said as a matter of law that defendant's conversation with his friend constituted "interrogation" (*see generally People v Naradzay*, 11 NY3d 460, 468 [2008]).

Here—as in *Arizona v Mauro* (481 US 520 [1987])—it is undisputed that the investigator did not converse with or question defendant during this encounter (*see id.* at 527). Nor has defendant established that a discussion of this nature rose to the level of a "psychological ploy that properly could be treated as the functional equivalent of interrogation" (*id.*) or a subterfuge to circumvent attachment of the indelible right to counsel. The investigator initially refused to allow the woman to meet with defendant but he relented only after she persistently demanded to speak with defendant—and after she was specifically informed that the officer would be in the room taking notes of the conversation (*see id.* at 528). Defendant was also clearly aware that the police officer was listening to the verbal exchange since the investigator was only a few feet away when the friends conversed. Despite these circumstances, defendant nevertheless stated that an animal was not involved; the case was open and shut; he was going to jail and would get what he deserved; and that he could not say that a person was not dead. On these facts, the courts below did not err in finding that defendant's assertions were voluntary and admissible at trial.

Our concurring colleague believes that *Mauro* is distinguishable (*see* concurring op at 675 n), but the facts of *Mauro* belie this assertion. The police officer in *Mauro* acknowledged that he " 'sent an officer in there to listen to that conversation' " knowing " 'that it was possible that [Mauro] might make incriminating statements' " and that he " 'wanted to record that conversation so as to have a record of those incriminating statements' " (481 US at 524 n 2). More poignantly for purposes of this appeal, *Mauro* specifically explained that "[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself" (481 US at 529). Contrary to the concurrence's claim, the fact that the investigator listened to defendant's conversation in order to record any inculpatory statements is not

determinative and there is no basis for suppressing the voluntary statements that defendant made to his acquaintance.

As a final matter, there is no merit to defendant's challenge to the legality of his detention by the police (*see generally People v Williams*, 17 NY3d 834, 835-836 [2011]).

Accordingly, the order of the Appellate Division should be affirmed.

RIVERA, J. (concurring). I agree with the majority that the emergency doctrine exception applies where police have a basis to reasonably believe "that a person may have been seriously injured and in need of imminent emergency assistance." (Majority op at 671.) However, I disagree with its conclusion that the police conduct following the termination of the emergency did not violate defendant's rights. In my opinion, after the emergency ended, the police continued to act in disregard of defendant's prior demands to speak with his lawyer and undermined his right to counsel.

The emergency doctrine is an exception to the established constitutional prohibition on police interrogation in violation of a suspect's right to counsel. This exception allows police questioning of a suspect, in derogation of the usual *Miranda* warnings, where the police may have reasonable grounds to believe an emergency exists that demands their immediate attention. (*See New York v Quarles*, 467 US 649, 656 [1984] ["we do not believe that the doctrinal underpinnings of *Miranda* require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety"].) The doctrine permits questioning even where the suspect has specifically invoked his right to counsel. (*See People v Krom*, 61 NY2d 187, 200 [1984] ["the police did not violate the defendant's right to counsel under the State Constitution by questioning him concerning the victim's whereabouts"].) However, once the emergency ends, the exception no longer applies. (*Krom*, 61 NY2d at 200; *see also People v Molina*, 248 AD2d 489, 490 [2d Dept 1998].) The doctrine is, thus, subject to temporal limits on the suspension of a suspect's rights to speak with an attorney and on police interrogation outside the presence of counsel. Without a temporal limit, the exception would potentially engulf, or otherwise encumber, a suspect's rights to refuse to respond to police questioning and seek assistance of counsel. The policy reasons supporting the emergency doctrine, and its attendant suspension of law enforcement's

duty to inform the defendant of his rights in accordance with *Miranda* and the prohibition on custodial interrogations outside the presence of counsel, also support the immediate reestablishment of the defendant's rights to their pre-emergency status, once the police are no longer faced with "grounds to believe that there is an emergency at hand and an immediate need for their assistance" (*People v Molnar*, 98 NY2d 328, 332 [2002]; *see also* majority op at 670).

Here, as the People concede, once the body was discovered the emergency ended. Thus, no reasonable basis existed for the continuation of the application of the emergency exception to the defendant. At that time, defendant, who had previously asked for counsel, was entitled to the termination of all custodial questioning, and to speak with an attorney. (*See Krom*, 61 NY2d at 200 ["The police . . . should not have continued to question the defendant in the absence of counsel once the victim's body was found"].) The fact that defendant did not repeat his request for counsel did not constitute a waiver of his original request; such waiver, in fact, would be invalid outside the presence of counsel. (*See People v Cunningham*, 49 NY2d 203, 209 [1980].)

Rather than cease their efforts to search for evidence and realign their conduct with well established precedent, the police continued to extract information from defendant outside the presence of counsel. According to the record, the investigator was fully aware, at approximately 1:00 a.m., that a body had been discovered after being notified over his police radio. This same investigator was equally aware of defendant's invocation of counsel earlier in the night. Yet, more than two hours after the police discovered the body, the investigator sought to secure incriminating statements from the defendant without the defendant having had the benefit of speaking with a lawyer even once during the course of a custodial process which lasted at least six hours. The investigator admitted that he was hoping the defendant would make incriminating statements when he permitted the defendant's female acquaintance to address the defendant.

The majority relies on *Arizona v Mauro* (481 US 520 [1987]) to support its conclusion that the use of the female acquaintance was not the functional equivalent of an interrogation. However, *Mauro* is distinguishable because it did not involve police conduct following suspension of defendant's rights under the emergency doctrine, nor did it involve the admitted efforts by law enforcement to elicit incriminating statements from the

defendant. In *Mauro*, the police advised the defendant of his *Miranda* rights, the defendant invoked his right to counsel and all questioning ceased. The police, however, permitted the defendant's wife to speak with the defendant. The Court concluded that the police conduct, absent any evidence or suggestion of improper motives, did not constitute an interrogation. (481 US at 529.) As the Court noted in *Mauro*, "[n]or [was] it suggested—or supported by any evidence—that [the officer's] decision to allow Mauro's wife to see him was the kind of psychological ploy that properly could be treated as the functional equivalent of interrogation." (*Id.* at 527.) Also, there was "no evidence that the officers sent [Mauro's wife] in to see her husband for the purpose of eliciting incriminating statements." (*Id.* at 528.)* Those concerns, however, are exactly at issue in the defendant's case. First, allowing a friend to speak with the defendant after the police had spoken with him, and while in custody, carried a certain amount of psychological impact. Second, the investigator's sole articulated reason for allowing the friend to speak to the defendant was to record incriminating statements.

On these facts, I cannot agree with the majority that the investigator's actions were not "a subterfuge to circumvent attachment of the indelible right to counsel." (Majority op at 672.) The clearly opportunistic use of the situation cannot be reconciled with defendant's right to speak with an attorney.

For the same reasons, I would find that the police conduct also violated defendant's rights under our State Constitution. It bears repeating that our Constitution provides more expansive protections than the Federal Constitution. (*People v Alvarez*, 70 NY2d 375, 378 [1987] ["in determining . . . the guarantees of fundamental rights of the individual in the Constitution of the State of New York, this court is bound to exercise its independent judgment and is not bound by a decision of the Supreme Court of the United States limiting the scope of similar guarantees in the Constitution of the United States"].)

Nevertheless, as made immensely clear by the record and the majority's discussion of the evidence, it cannot be said that the

---

* The majority contends that the cases are indistinguishable because officers in both cases acted merely in the "hopes" of overhearing incriminating statements. Yet in *Mauro*, the officers asserted safety and security reasons for observing Mauro and his wife, but also acknowledged the possibility that Mauro might incriminate himself. Here, the investigator's only reason for being present in the room with the defendant and his friend was to overhear and record the defendant's potentially incriminating statements.

defendant's statements to his friend were of the type that creates "a reasonable possibility that the [error] might have contributed to the conviction." (*See People v Crimmins*, 36 NY2d 230, 241 [1975].) Therefore, I concur.

Chief Judge LIPPMAN and Judges READ, SMITH, PIGOTT and ABDUS-SALAAM concur with Judge GRAFFEO; Judge RIVERA concurs in result in an opinion.

Order affirmed.