People v Lang (2018 NY Slip Op 05639)





People v Lang


2018 NY Slip Op 05639


Decided on August 2, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: August 2, 2018

109237

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
DAVID R. LANG, Appellant.

Calendar Date: June 4, 2018

Before: McCarthy, J.P., Egan Jr., Lynch, Devine and Aarons, JJ.


Tendy Law Office, New York City (Matthew S. Hellman admitted pro hac vice), for appellant.
Kristy L. Sprague, District Attorney, Elizabethtown (James E. Martineau of counsel), for respondent.



MEMORANDUM AND ORDER
Lynch, J.
Appeal from a judgment of the County Court of Essex County (Meyer, J.), rendered November 13, 2015, upon a verdict convicting defendant of the crimes of murder in the second degree and criminal possession of a weapon in the fourth degree.
In June 2012, defendant fatally shot his brother (hereinafter the victim) outside of the farmhouse that they shared in the Town of Crown Point, Essex County. In June 2013, defendant pleaded guilty to manslaughter in the first degree. In April 2015, this Court reversed the judgment of conviction and vacated the plea after determining that the plea was coerced (127 AD3d 1253 [2015]). On remittal, following a trial held over nine days, defendant was convicted of murder in the second degree and criminal possession of a weapon in the fourth degree and sentenced to an aggregate prison term of 17 years to life. Defendant now appeals.
Initially, we find that County Court correctly denied defendant's motion to suppress the statements that he made to the police. "As a general rule, a person who is in custody cannot be questioned without first receiving Miranda warnings" (People v Doll, 21 NY3d 665, 670 [2013] [citation omitted], cert denied ___ US ___, 134 S Ct 1552 [2014]; see People v Henry, 114 AD3d 1025, 1026 [2014], lv dismissed 22 NY3d 1199 [2014]). Because "the Constitution is not a barrier to a police officer seeking to help someone in immediate danger," an exception to this [*2]rule exists where an officer's questions are "an objectively reasonable response to an apparently exigent situation" (People v Doll, 21 NY3d at 670). To establish this emergency exception, "(1) the police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property and this belief must be grounded in empirical facts; (2) the [questioning] must not be primarily motivated by an intent to arrest . . .; and (3) there must be some reasonable basis, approximating probable cause, to associate the emergency with the [questions]" (id. at 671). If an "improper, unwarned statement gives rise to a subsequent Mirandaized statement as part of a single continuous chain of events, there is inadequate assurance that the Miranda warnings were effective in protecting a defendant's rights, and the warned statement must also be suppressed" (People v Paulman, 5 NY3d 122, 130 [2005] [internal quotation marks and citation omitted]; accord People v Neal, 60 AD3d 1158, 1159 [2009], lv denied 12 NY3d 857 [2009]).
At the suppression hearing, Christopher Bogart, a State Trooper, testified that he went to defendant's house in response to a domestic disturbance 911 call. While en route, a dispatcher advised that defendant had reported that he shot his brother, that he was inside the house and that he had left a gun on the porch. Jason Peters, another State Trooper, testified that he arrived at defendant's house at the same time in a separate car. Both Bogart and Peters left their police vehicles in the road rather than drive them onto the property. Bogart approached the house first, with his gun drawn, and Peters followed and took cover behind a tree on defendant's lawn. Peters testified that when defendant came out of the house, he could tell that he did not have anything in his hands. Bogart recalled that as he approached defendant, he could see the victim lying in the nearby driveway. Bogart placed handcuffs on defendant and told him he was under arrest. Peters asked defendant where the victim was and defendant told him that he was in the driveway. Peters ran to check on the victim, discovered that he was still alive, called emergency medical services and went to move his police vehicle out of the road and onto the property. Peters returned to defendant and Bogart and held defendant — who had begun to complain about the pain in his knees — as Bogart went to move his police vehicle closer to defendant's house so that defendant would have a place to sit. Peters asked where the gun was and defendant told him it was on the porch. Without moving from where he was standing outside of the house, Peters looked and could see the gun on top of a refrigerator, the barrel pointed towards them. Both Peters and Bogart recalled that defendant and the victim's other brother drove onto the property before the gun was secured, and Peters yelled at him to leave as he was going onto the porch to get the gun off the refrigerator. Once the gun was secured, Bogart placed defendant into his nearby police car and read him his Miranda rights.
Based on this testimony, there were two questions asked while defendant was in custody and prior to being read his Miranda rights. Although defendant characterizes the scene as relatively calm and deliberate, in context, we cannot agree. The two officers arrived at defendant's remote farm knowing that defendant shot his brother and that there were a number of family members living nearby — indeed, within minutes of their arrival, one sibling arrived and had to be directed to leave. Neither officer knew whether anyone else was in the house or on the property, nor whether defendant had access to more than one gun. The questions that Peters asked were not intended to obtain evidence but to try to quickly help the victim and to secure the area so emergency medical services could do their work. In our view, Peters had reasonable ground to believe that there was an "emergency at hand" (People v Doll, 21 NY3d at 670-671), and these concerns permitted Peters to pose the limited questions prior to advising defendant of his Miranda rights (see People v Dawson, 149 AD3d 1569, 1571 [2017], lvs denied 29 NY3d 1125, 1133 [2017]). Because this questioning was permitted, we reject defendant's claim that it [*3]was necessary to suppress the later statements made following Bogart's administration of a Miranda warning (see People v Paulman, 5 NY3d at 130; People v Neal, 60 AD3d at 1159).
Defendant also contends that his conviction for murder in the second degree is against the weight of the evidence. If an acquittal is not unreasonable, "our weight of the evidence review requires us to view the evidence in a neutral light and weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Peterkin, 159 AD3d 1196, 1197 [2018] [internal quotation marks and citations omitted]; see People v Bleakley, 69 NY2d 490, 495 [1987]; People v Criss, 151 AD3d 1275, 1276-1277 [2017], lv denied 30 NY3d 979 [2017]). A person is guilty of murder in the second degree when, "[w]ith the intent to cause the death of another person," he or she causes the death of another person (Penal Law § 125.25 [1]; see People v Ryder, 146 AD3d 1022, 1024 [2017], lv denied 29 NY3d 1086 [2017]). The element of intent is established where a person's "conscious objective is to cause such result" (Penal Law § 15.05 [1]). Evidence of intoxication may be presented to negate the element of intent (see CPL 15.25; People v Mould, 143 AD3d 1186, 1187 [2016], lv denied, 28 NY3d 1187 [2017]).
At trial, Bogart and Peters testified that at approximately 3:00 p.m. on the day in question, they went separately to defendant's farm following defendant's 911 call reporting that he had shot the victim. As Bogart approached the house, he observed the victim lying in the driveway. After complying with the troopers' orders to come out of the house, defendant was promptly handcuffed. Peters seized a .22-caliber magnum that defendant identified as the rifle that he used to shoot the victim. Once placed in Bogart's car, defendant waived his Miranda rights and, in response to Bogart's questions, said that he meant to kill the victim, that it was not an accident and that "Yes, hell, yes, [he] wanted the [victim] dead."
Peter DeForest, the People's crime scene expert, testified that based on his review of the evidence, including his inspection of a hole in the hat found near the victim's body, the gunshot wound in the victim's head was consistent with a .22-caliber bullet that was stable in flight, i.e., not deflected off another object prior to striking the victim. Allan Wright, a forensic officer, testified that when he investigated the crime scene, he photographed a broken lilac branch in the vicinity of defendant's house and driveway and determined that the branch was broken and not struck by a bullet. DeForest similarly testified that the branch was a "greenstick fracture." In contrast, defendant's forensic expert testified that his review of the hat and gunshot wound led him to conclude that the bullet did pass through an intermediate object, and defendant's crime scene expert opined that the lilac branch was struck by a bullet and that he had never heard the term "greenstick fracture" in the context of a tree branch.
The jury heard the recording of the 911 call that defendant made at approximately 2:45 p.m. Notably, when the dispatcher asked defendant if he had been drinking, defendant responded, "Of course I've been drinking. I drink every [expletive] day." Both Peters and Bogart testified that they could smell alcohol on defendant's breath but that he was calm and that his speech was clear. Further, though defendant complained of pain in his knees, Bogart recalled that he appeared to be steady on his feet and able to walk. When the police sent defendant for a blood test at approximately 9:00 p.m., nearly six hours after he was taken into custody, his blood alcohol content (hereinafter BAC) was .18%. Defendant presented testimony by Sherry Kacinko, a toxicologist, who opined that if defendant's blood had been tested at 3:00 p.m., his BAC would have been between .27% and .36%. Kacinko conceded, however, that this calculation was dependent upon many unknown factors, including when defendant last consumed alcohol.
In our view, an acquittal would not have been unreasonable, inasmuch as the jury could have determined that defendant was too intoxicated to intend to kill the victim and that the victim was instead accidentally struck by a deflected bullet. Undoubtedly, whether a defendant is too intoxicated to form the intent to commit a crime is an issue for the jury (see People v King, 124 AD3d 1064, 1065 [2015], lv denied 25 NY3d 1073 [2015]; People v Kenyon, 108 AD3d 933, 939 [2013], lv denied 21 NY3d 1075 [2013]; People v Keller, 246 AD2d 828, 828-829 [1998], lv denied 91 NY2d 1009 [1998]). Here, although the evidence demonstrated that defendant was drinking on the day that he shot the victim, it also demonstrated that he admitted that he acted purposefully after an argument with the victim. Upon our review of the record, we are unable to conclude that the jury's verdict was against the weight of the evidence (see People v Mould, 143 AD3d at 1187; People v King, 124 AD3d at 1066; People v Kenyon, 108 AD3d at 939).
Next, defendant contends that County Court should have given a curative instruction because the police failed to preserve the lilac branch and obtain defendant's BAC earlier. According to defendant, if the lilac branch had been preserved, it could have been examined by his expert to determine whether it had deflected a bullet, and, if his BAC had been taken earlier, it would have shown that he was too intoxicated to form the requisite intent for murder in the second degree. We discern no error. The investigators took multiple photographs of the branch but never took possession of it, so it remained on defendant's property. While the police undoubtedly had a duty to preserve evidence in its possession, there was no affirmative duty to gather evidence for defendant (see People v Hayes, 17 NY3d 46, 51 [2011], cert denied 565 US 1095 [2011]). As for defendant's BAC, his counsel requested at 4:42 p.m. that defendant's blood be drawn for testing, but the blood work was not done until approximately 9:00 p.m. Where, as here, evidence of defendant's intoxication was "unnecessary to their prosecution," the police were not required to acquire "potentially useful evidence" for defendant (People v Winchell, 250 AD2d 942, 943 [1998], lv denied 92 NY2d 931 [1998]).
Defendant next argues that he was deprived of a fair trial because County Court discharged a juror without first conducting a reasonably thorough inquiry and an opportunity to be heard. Generally, the trial court may discharge a juror and replace him or her with an alternate where he or she is "unable to continue serving by reason of illness or other incapacity, or for any other reason" after conducting a "reasonably thorough inquiry concerning such illness incapacity or unavailability" (CPL 270.35 [1], [2]). Upon the court's determination that "there is no reasonable likelihood that [the] juror will be appearing" within two hours of the time that the trial was scheduled to resume, the court may presume that the juror is unavailable (CPL 270.35 [2] [a]). The court must give the parties an opportunity to be heard prior to discharging a juror (see CPL 270.35 [2] [b]).
The record indicates that after bringing the jury in to begin the day's testimony, County Court advised that one juror would not be able to "finish the trial today" due to "an incredibly important appointment for a family member." The court continued, "we're sorry she couldn't finish the trial, so we'll have to use [an alternate] to finish the trial. We'll discuss this later. All right? And if you have some objections . . . anything else?" Defendant did not raise any objection in response. Later, during a break in the testimony and outside of the jury's presence, the court asked defense counsel whether he had a "problem" with this, noting that "when [the court] mentioned that [it was] going to replace [the juror] with [an alternate], you seemed to, at least body language-wise, have some reticence about that." Defense counsel thereafter questioned the limited "opportunity to be heard about this," to which the court responded, "If you want to be heard, go ahead." After some further discussion confirmed, among other things, that [*4]the juror had advised one day earlier that she would be out of town for a medical appointment for her child at a provider located five hours away, the court denied defense counsel's request to adjourn the trial for one day and ordered the juror's replacement by the alternate juror.
In context, we find that County Court engaged in the requisite reasonably thorough inquiry prior to determining that the juror would not be returning within two hours (see People v Jeanty, 94 NY2d 507, 516 [2000]) and that defendant had an opportunity to be heard prior to discharging the juror based on her unavailability. As the court noted, counsel selected both the juror and the alternate juror. Although defendant had a constitutional right to a trial by a "particular jury chosen according to the law, in whose selection [he] . . . had a voice[,] . . . replacement with an alternate juror is not, as a rule, a violation of the right to trial by jury [and] there is no material distinction between regular and alternate jurors" (id. at 517 [internal quotation marks and citations omitted]). Accordingly, we discern no error in the court's determination to replace the juror with an alternate juror.
Finally, defendant contends that the prosecutor's comments during summation deprived him of a fair trial. "Reversal based on prosecutorial misconduct during summation is warranted only if the misconduct is such that the defendant suffered substantial prejudice, resulting in a denial of due process" (People v Wynn, 149 AD3d 1252, 1255 [2017] [internal quotation marks and citations omitted], lv denied 29 NY3d 1136 [2017]). Whether a defendant has been deprived of a fair trial "hinges upon the severity and frequency of the conduct, whether the trial court took appropriate action to dilute the effect of the conduct and whether, from a review of the evidence, it can be said that the result would have been the same absent such conduct" (id. [internal quotation marks and citations omitted]).
As defendant points out, during summation the prosecutor frequently prefaced conclusions with "I think" or "I don't believe." When defense counsel objected to such commentary, County Court overruled, explaining that the prosecutor is "entitled to make an argument . . . of the inferences and conclusions he believes reasonably and logically flow from the facts." This objection and response occurred two more times, after which defense counsel registered his "continuing objection to [the prosecutor's] opinion and inserting his own opinions into this case." The court responded that the prosecutor is "entitled to state what he thinks the evidence shows" and that "[s]o long as he stays away from [vouching for a witness's credibility], he can state what the evidence shows in his opinion."
Although defendant now contends that the prosecutor did, in fact, thereafter vouch for witnesses' credibility "repeatedly," defense counsel did not object to any such instance during the trial. Accordingly, we find that his claim that such statements deprived him of a fair trial are not preserved for review (see People v Wynn, 149 AD3d at 1256). If we were to consider defendant's claims, we would find that the prosecutor either did not vouch for any witness's credibility or that this was proper commentary offered in response to defendant's argument during summation (see People v Jackson, 160 AD3d 1125, 1129 [2018]; People v Heiserman, 127 AD3d 1422, 1424 [2015]). Similarly, although defendant preserved his argument with regard to the prosecutor offering his opinion during summation, we discern no error. The prosecutor's summation was responsive to defendant's arguments during summation. Further, County Court reminded the jury during its instructions that "the summations . . . are not evidence . . . only each lawyer's view of the facts, inferences and conclusions that they contend may properly be drawn from the evidence. Whatever the lawyers said and however they said it, you should remember that what the lawyers said is simply argument submitted for your consideration." In context, [*5]notwithstanding the prosecutor's stylistic choice to use personal pronouns (see People v Franklin, 288 AD2d 751, 755 [2001], lv denied 97 NY2d 728 [2002]), we find that the People's summation was a fair commentary on defendant's summation, and that the cumulative effect of the challenged comments was not "so prejudicial as to deny defendant his fundamental right to a fair trial" (People v Thomas, 155 AD3d 1120, 1124 [2017], lv denied 31 NY3d 1018 [2018]; see People v Franklin, 288 AD2d at 755).
McCarthy, J.P., Egan Jr., Devine and Aarons, JJ., concur.
ORDERED that the judgment is affirmed.